In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1196

JAMAL M. MAAROUF,

Plaintiff-Appellant,

v.

WALKER MANUFACTURING COMPANY, a division
of Tenneco Automotive, Incorporated,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 97 C 319--William C. Lee, Chief Judge.

Argued September 10, 1999--Decided April 12, 2000

Before POSNER, Chief Judge, and EASTERBROOK, and
ROVNER, Circuit Judges.

ROVNER, Circuit Judge.  This case arrives here
after a grant of summary judgment to defendant
Walker Manufacturing Company ("Walker") in the
district court. Jamal M. Maarouf sued Walker,
alleging that it violated his rights under Title
VII of the Civil Rights Act of 1964, 42 U.S.C.
sec.2000 et seq. in discriminating against him in
training, promotion, and termination based on his
Arabic heritage and Muslim faith, and in
retaliating against him for his complaints of
discrimination.

Walker manufactures components of automobile
exhaust systems in its Ligonier, Indiana plant.
Maarouf was hired to work as a Coordinate
Measuring Machine ("CMM") operator in February
1993, after working there for six months as a
temporary employee. The position of CMM operator
encompassed keeping records, maintaining gauges,
fixing various handtools, and writing programs
for the CMM. Operators worked in three shifts,
the first running from 6 a.m. until 2 p.m.,
followed by the 2-10 p.m. shift and the third
shift from 10 p.m. until 6 a.m. CMM operators are
trained on the job by more experienced operators
and through using the equipment. Experienced
operators were available to help in training on
the entire first shift and for four hours of the

second shift, but no experienced operators were available to fulfill that role on the third shift. Maarouf worked on each of the three shifts at various times, although he estimated that he spent 90% of his time on the third shift. During his tenure there, he received training from Dwight DeWitt, Theresa Allen, and Gary Frey. He ultimately was terminated for poor work performance after his supervisors documented performance problems including lengthy work breaks, problems completing assignments in a timely manner, and the inability to acquire adequate programming skills. Maarouf attributes his programming deficiencies to the lack of training opportunities, and asserts that his termination was based on discriminatory animus rather than poor work performance.

I.

We turn first to Maarouf's allegations that Walker discriminated against him by denying him adequate training, by failing to promote him, and by terminating his employment. Maarouf may prove discrimination under Title VII through direct evidence, or indirectly through the burden-shifting mechanism of McDonnell-Douglas. McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973); Crim v. Bd. of Educ. of Cairo School Dist. No. 1, 147 F.3d 535, 540 (7th Cir. 1998). In this case, Maarouf has attempted to prove discrimination indirectly under the McDonnell-Douglas test, and thus must first establish a prima facie case of discrimination. 147 F.3d at 540. He may do that by establishing that he is a member of a protected class, that he suffered an adverse employment action, that he was meeting his employer's legitimate performance expectations, and that his employer treated similarly situated employees who were not in the protected class more favorably. Stalter v. Wal-Mart Stores, Inc., 195 F.3d 285, 289 (7th Cir. 1999). If that is established, the burden shifts to Walker to provide a legitimate, non-discriminatory reason for the action. Id. If Walker meets that burden, then the burden shifts back to Maarouf to establish that the reasons proffered by the defendant were pretextual. Id.

Regarding the failure to train claim, the district court entered summary judgment for Walker because Maarouf failed to present evidence that he received less training than other employees. The type and lengths of training varied considerably among the employees. Some employees were trained by being assigned immediately to the first shift, where they could receive individual instruction on programming and other skills from CMM operators working that shift. Other employees were assigned to the second shift, in which CMM operators were only

available for four of the eight hours to aid in their instruction. Maarouf complains that he received less training than anyone because he was assigned to the third shift for 90% of his time with the company, and was the only CMM operator on that shift. Maarouf, of course, had worked for Walker as a temporary worker before being hired on a permanent basis, and thus had some familiarity with the equipment from the start. Even if he was hired in the same situation as other employees, however, his training was comparable to that of other employees. Maarouf does not dispute that he was assigned to the first shift for a total of three months, at which time other operators were available to aid in his training. He complains that two of those months came only at the end of his employment, but that is irrelevant. After 28 months of obtaining familiarity with the machines, the two months on the first shift would presumably be even more useful. Maarouf does not contend that his programming skills improved dramatically in the two months preceding the termination. In addition to those three months, Maarouf was allowed to "overlap" from the third to the first shift to ask questions of the operators on the first shift. The district court noted that he was permitted  hour to 45 minutes daily after the third shift, which when added together yielded a total of 6-9 weeks of further training. Maarouf does not dispute those numbers, but argues instead that there was no evidence of how often he actually used those opportunities. Again, that misses the point. Maarouf is complaining that he did not receive the same training opportunities as other employees. The relevant issue is what training Walker made available to him, not whether he availed himself of those opportunities. Finally, Maarouf was also sent on a five-day trip to Detroit for a training seminar on CMM software, conducted by the creators of the software.

Those training opportunities are equivalent to that offered other Walker employees. For instance, Otis Patterson received three months of training on the first shift when he was hired, at which time he was moved to the second shift. Maarouf similarly received a total of three months on the first shift, and in addition was provided the 6-9 weeks of "overlap" training opportunities. Moreover, this training was provided to him at a time in which he had already gained substantial familiarity operating the CMM. Therefore, the undisputed facts demonstrate that his training was equivalent to that received by other CMM operators, and thus he has failed to support his allegation that he was discriminated against in training.

His arguments regarding the lack of training

opportunities are repeated in both his termination and his promotion discussions. Regarding the failure to promote, Maarouf argues that he was discriminated against in Walker's failure to promote him to the position of layout technician. He acknowledges that the layout technician position requires superior programming skills which he did not possess, but he argues that his failure to obtain those skills stemmed from the lack of training opportunities. Because we have rejected his argument that he was denied equivalent training opportunities, his failure to promote argument must fail as well. Moreover, as we held in Pafford v. Herman, 148 F.3d 658, 669 (7th Cir. 1998), a failure to promote claim is distinct from a failure to train claim. "One of the prima facie elements of a failure to promote claim is that the plaintiff demonstrate that she was qualified for the promotion position. If the plaintiff was not qualified for any reason, then she falls short of establishing a prima facie case and there is no inference of discrimination." Id. Maarouf cannot succeed on his failure to promote claim because he concedes that he lacked the skills to perform the desired position. Where the failure to acquire the skills necessary for promotion stemmed from a discriminatory denial of opportunities, the employee must bring a discrimination claim challenging the denial of opportunities rather than a challenge to the failure to promote. Maarouf brought that in his failure to train claim. Because he concedes that he did not possess the programming skills needed for the position of layout technician, the failure to promote claim is baseless.

That leads us to Maarouf's contention that Walker discriminated against him when it terminated his employment. In response, Walker asserted that it terminated him based on a documented history of poor work performance. The district court held that Maarouf failed to raise sufficient allegations of pretext to survive summary judgment. Maarouf's brief on appeal thus centers on the pretext argument. Specifically, he argues that the justification provided by Walker for the termination, poor work performance, was not the real reason for its decision. In support of that contention, he points to discriminatory comments allegedly made by his supervisor Theresa Allen, the lack of equivalent training opportunities, and alleged inconsistencies between the performance comments and their supervision of him. We have already rejected his argument regarding the alleged disparity in training opportunities, and therefore he can succeed only if the remaining arguments are valid.

Maarouf presented significant evidence of

discriminatory remarks by Allen, which would alone cast doubt on the basis for the termination if Allen was the one who made the decision to terminate his employment or influenced that decision. Maarouf related numerous statements allegedly made by Allen which belittled the Muslim religion and disparaged Arab people. Moreover, Maarouf presented an affidavit from another employee, Barbara Boyles, attesting that Allen made remarks evincing a discriminatory animus towards Maarouf based on his Arabic heritage and Muslim faith. Those comments, although not tying the termination to his heritage and faith and thus not providing direct evidence of discrimination, provide substantial evidence that Allen's opinion of Maarouf was clouded by her discriminatory animus. We have previously held that

[t]here is only one situation in which the prejudices of an employee, normally a subordinate but here a coequal, are imputed to the employee who has formal authority over the plaintiff's job. That is where the subordinate, by concealing relevant information from the decisionmaking employee or feeding false information to him, is able to influence the decision. Conn v. GATX Terminals Corp., 18 F.3d 417, 420 (7th Cir. 1994); Gusman v. Unisys Corp., 986 F.2d 1146, 1147 (7th Cir. 1993); Shager v. Upjohn Co., supra, 913 F.2d at 405. In such a case, the discriminatory motive of the other employee, not the autonomous judgment of the nondiscriminating decision-maker, is the real cause of the adverse employment action. If the other employee merely utters a hostile stereotype, he is not manipulating the decision.

Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1400 (7th Cir. 1997). Accordingly, if the perception of poor work performance was based upon Allen's input, then Maarouf has presented sufficient evidence of pretext to survive summary judgment.

  The perception of inadequacies in Maarouf's work performance, however, did not arise solely from Allen, but was also independently noted by his other supervisors. For instance, John Muszkiewicz, Allen's supervisor and the manager of Quality Assurance, met with Maarouf in June 1994 to discuss performance problems. His notes from that meeting reflect that he expressed concerns with Maarouf's job performance based on his own observations and input from others including Allen. Those performance concerns centered on Maarouf's poor use of time, tendency to clock in early and out late, inadequate quantity of work, and subpar programming skills. Furthermore, Gary Frey, who was Maarouf's

supervisor prior to Allen, reviewed Muszkiewicz's notes and stated that they were consistent with performance problems he recalled noting in early 1994. In July 1994, Tim Trine replaced Muszkiewicz, and he also noted performance problems. For instance, Trine stated that he heard from several sources, including Muszkiewicz, that Maarouf had been observed sleeping on the job during the third shift. Trine and Allen met with Maarouf and informed him that he needed to improve in a number of areas such as programming, completion of assigned tasks, ability to work independently, reading of blueprints, and length of breaks. In fact, Maarouf does not dispute his deficiencies in programming. Ultimately, Maarouf was terminated after receiving a universally poor evaluation from Allen in January 18, 1995, and then taking an excessive amount of time to locate catalogs and order certain tools pursuant to Allen's request. He took anywhere from three hours, by Maarouf's testimony, to eight hours by Allen's accounting, to perform that task. Allen provided a performance report to Trine, and Trine decided to terminate Maarouf's employment.

Even discounting entirely Allen's perceptions regarding Maarouf's work performance, Maarouf has failed to demonstrate pretext because three other supervisors independently noted similar problems with his performance. Therefore, the taint of Allen's discriminatory comments does not extend to those independent judgments regarding his performance. Maarouf has presented no viable argument that those supervisors were also motivated by discrimination in their assessments of his performance, or that their opinions were based on Allen's perceptions rather than their own experience with Maarouf. Therefore, he has failed to establish that the performance concern was not the real reason for the decision to terminate his employment. Accordingly, the district court properly granted Walker summary judgment on the claims regarding the termination, training, and promotion.

II.

We are left, then, with Maarouf's claim that Walker terminated him in retaliation for his complaints of discrimination. In order to succeed on his retaliation claim, Maarouf must establish that he engaged in statutorily protected expression, he suffered an adverse action by his employer, and there was a causal link between the protected expression and the adverse action. Alexander v. Gerhardt Enterprises Inc., 40 F.3d 187, 195 (7th Cir. 1994). Maarouf's support for his retaliation claim rests largely on the timing of the termination. According to Maarouf, on

January 19, 1995, he complained to Pat Tusing, a human resources coordinator, about his poor evaluation from Allen and he alleged discrimination. On January 23, 1995, Maarouf claims that he spoke with Tusing again, and Tusing said she had spoken about the complaint with Steven Busch, who was head of Human Resources. Maarouf also notes that he met with Trine on January 23 as well. Maarouf was fired on January 25. He argues that the timing of the termination renders it retaliatory.

The critical issue here, however, is whether the person who made the decision to terminate his employment was aware of the discrimination allegations at the time, because absent such knowledge Maarouf lacks a causal link between the termination and the complaint of discrimination. See Dey v. Colt Construction & Development Co., 28 F.3d 1446, 1458 (7th Cir. 1994). The decision to terminate Maarouf's employment was made by Trine, and was then reviewed by Busch, Allen and Andrew Weeks, the plant manager. At this stage of the proceedings on summary judgment, Maarouf need not prove by a preponderance of the evidence that Trine was aware of his discrimination complaint, but he must at least produce evidence that would support an inference that Trine was so aware. Id. He has failed to do that here. Trine maintains that he was not aware of the discrimination allegation when he made the termination decision and Maarouf has pointed to no evidence in the record that refutes Trine's statement. Maarouf submitted portions of his deposition in support of his motion for summary judgment, but his statements regarding his communications with Trine at the January 23 meeting are generally vague and non-responsive. When asked whether he discussed the alleged discrimination with Trine, he repeatedly states only that Trine did not want to hear anything more from him and he could not get Trine's attention. At one point, however, he provides a clearer answer. When asked whether, at that meeting with Trine, he discussed his belief that he had been treated differently from other employees because of his Arabic heritage, Maarouf answered "no." Similarly, when queried whether he discussed with Trine evidence of how he had been treated differently from other employees because of his Muslim religion, he responded "not at that meeting." Finally, Maarouf had an opportunity later in the deposition to further clarify this issue in the following colloquy:

Q  You raised that concern [of discrimination] with Pat Tusing but you didn't raise that with Mr. Busch or Mr. Trine, correct?

A  As I said, Mr. Trine told me don't say nothing, don't speak, don't answer, don't argue,

don't discuss, don't say nothing, anything you
say don't count for nothing anyway, Anything
Jamal going to say don't count for nothing.

Q  Is the answer to my question yes or no?

A  Repeat the question.

MR. ZIMMERMAN:  Would you read--

That unfortunately is all that we have. Maarouf
did not supply the next page of the deposition,
which presumably would have firmly established
whether Trine was notified of the discrimination
before he made the decision to terminate
Maarouf's employment. Because he has failed to
identify any evidence that Trine was aware of the
discrimination allegations at the time of the
termination decision, he has not established any
causal connection between the discrimination
allegations and the termination. The district
court properly granted summary judgment on the
retaliation claim.

  For the reasons stated above, the decision of
the district court is affirmed.