Daryl L. JOHNSON, Plaintiff,

v.

CAMBRIDGE INDUSTRIES INC. and Meridan Automotive Systems Inc, Defendants.

No. IP00–1540–C–B/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Nov. 28, 2001.

Richard L Darst, Cohen Garelick & Glazier, Indianapolis, IN, for plaintiff.

Robert M Kelso, Kightlinger & Gray, Indianapolis, IN, Brent D Rector, Miller Johnson Snell & Cummiskey, Grand Rapids, MI, for defendants.

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BARKER, District Judge.

### I. *Introduction.*

This is an employment discrimination case brought pursuant to Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e et seq. and 1981a. The plaintiff, Daryl Johnson, alleges that his employer, Cam-

bridge Industries,[1] discriminated against him on the basis of his race, tolerated or condoned a racially hostile atmosphere in the work place, and then retaliated against him for filing an EEOC charge complaining about the race discrimination. The case is before us on Cambridge's motion for summary judgment as to all three claims. For the following reasons we GRANT defendant's motion.

## II. *Statement of Facts.*

All of the facts recited here are either undisputed by the parties or are stated in a light reasonably most favorable to Mr. Johnson.

Mr. Johnson, an African American, began working for Cambridge at its Rushville plant in June of 1996. Cambridge filed for bankruptcy, and in July 2000 Meridian acquired some of Cambridge's facilities. Meridian manufactures automotive parts, as did Cambridge before it. Mr. Johnson remains employed at Meridian as a "production associate" who builds automotive replacement parts. Def. Facts ¶¶ 1–3.[2]

Prior to 1999, Mr. Johnson reported to Production Manager Beverly Harney, an African American. Since then, he has reported to Area Manager Paul Wiley and acting Plant Manager Ronald Szydlowski, both Caucasian. Def. Facts, ¶ 5; Pl. Response, ¶ 5; Pl. Add. Facts, ¶ 75. Eric Williams, an African–American, served as team leader at relevant times. Pl. Add. Facts, ¶ 76. Mr. Johnson alleges that none of the discriminatory and retaliatory incidents that he enumerates occurred before May 1999, when co-employees Ross Springman and Brian Durham made ra-

cially derogatory remarks. Def. Facts, ¶ 5 (Pl.Reply).

Mr. Johnson was (and apparently remains) an employee whose work performance management respects. He has had excellent performance reviews and his supervisors have praised his ability not only to perform his own tasks but also to help train others. Pl. Add. Facts, ¶ 81. In July 1997, Production Manager Beverly Harney stated:

> Daryl is a pleasure to work with. Daryl takes the initiative to make things happen on every job he's been assigned to. If there is down time on a job, Daryl is scheduled to run, he always find[s] something productive to do. Housekeeping is an area Daryl could improve. Attendence [sic] is great. You can put Daryl on any job and get results.!!!

Pl. Add. Facts, ¶ 82. In November, 1999, Production Manager Paul Wiley rated his performance as excellent and stated that Mr. Johnson "[k]nows most jobs in the shop, very good resource on old jobs not ran [sic] frequently." Pl. Add. Facts, ¶ 84. Materials Manager Dave Hittle and Acting Plant Manager Ron Szydlowski told Eric Williams that Daryl Johnson is the best worker. Pl. Add. Facts, ¶ 85.

In May 1999, Cambridge posted openings for two "team leaders." A team leader is a production employee who helps other employees and guides their work performance. A team leader earns a higher hourly wage than similarly-situated production employees, so that being elected team leader was a promotion for a production employee such as Mr. Johnson. John-

---

1. Meridian is Cambridge's successor. After Cambridge filed for bankruptcy, Meridian purchased some of its facilities in July 2000. All of the alleged discriminatory acts took place prior to Meridian's purchase. We refer to the employer throughout as Cambridge.

2. We refer to defendant's Statement of Material Facts as "Def. Facts, ¶ ___" throughout this entry. We refer to plaintiff's Statement of Additional Material Facts as "Pl. Add. Facts, ¶ ___."

son Dep., p. 141; Def. Facts, ¶ 33. Mr. Johnson, among others, applied for the position. Pl. Add. Facts, ¶ 90; Def. Facts, ¶¶ 29, 30. By vote of the production employees, both Mr. Johnson and his co-employee Josh Goad were elected team leaders. Pl. Add. Facts, ¶ 97.

Cambridge corporate personnel, however, rescinded the plan to add two team leaders. It decided to add none, so that Mr. Johnson and Mr. Goad were deprived of the positions to which they had been elected. Pl. Add. Facts, ¶ 98. Def. Facts, ¶ 31. Mr. Johnson is under the impression that Mr. Goad was later appointed a team leader. Production Area Manager Paul Wiley, who reviewed Mr. Goad's performance, testified that Mr. Goad *never* served as a team leader. Wiley Aff., ¶ 2. That testimony is supported by Mr. Goad's November 1999 employment review, which refers to him as a "production associate" since May 25, 1997, Def. Ex. G, and by the testimony of Human Resources Director Keith Kniepkamp. Kniepkamp. Aff., ¶ 2.

Mr. Johnson's not being appointed team leader is the flash point of this lawsuit. Mr. Johnson characterizes his not receiving the team leader position as a failure to promote or a "taking" of the position. Cambridge characterizes it as a non-action in that the corporation decided not to create the position after initially announcing that it would. Here, we merely note the fact that Mr. Johnson and Mr. Goad did not receive the promotions. We address its legal significance in subpart III–C below.

On October 18, 1999, Mr. Johnson filed an EEOC charge alleging that: (1) Cambridge discriminated against him because of his race by assigning to him the more difficult, heavier jobs; (2) coworker Ross Springman had made a racial remark in May, 1999; and (3) on one occasion Materials Manager Dave Hittle had harassed him by telling him to put on his safety glasses. Def. Facts ¶ 6. Eight days later, on October 26, 1999, Mr. Johnson filed another EEOC charge, this time alleging that Cambridge had retaliated against him for filing his first charge the week before. The retaliation alleged was refusing to give him a back brace and not allowing him to work while he was taking prescription pain killers and muscle relaxants. Def. Facts ¶ 7.

Mr. Johnson alleges—and it is here uncontested—that he was the subject of two racial remarks,[3] one by co-employee Ross Springman and a second by co-employee Brian Durham. Neither co-employee was a supervisor. Def. Facts, ¶ 11. Mr. Johnson was not present when either of the remarks was made. Def. Facts, ¶¶ 11, 12.

In the first instance, co-employee Ross Springman said that he was not going to be a candidate for the announced team leader positions because it was a foregone conclusion who would be chosen. Asked what he meant, Mr. Springman said: "Eenie, meenie, minie, moe, pick a nigger by his toe," a reference to Mr. Johnson, who was a candidate for team leader. Mr. Johnson later learned about Mr. Springman's comment from co-employee Josh Goad, who heard Mr. Springman make the comment. Def. Facts. ¶¶ 14, 15. Mr. Goad reported Mr. Springman's remark to

---

**3.** In responses to defendant's statement of material fact, plaintiff admits that he was the subject of two racial comments, but adds: "in addition to other racial remarks." Plaintiff cites plaintiff's deposition exhibit 11 for the proposition that there were "additional racial remarks." The cited exhibit, Mr. Johnson's first EEOC charge, does not support the proposition that there were "additional" racial remarks. Plaintiff expressly testified that the two remarks—one by co-employee Springman, the other by co-employee Durham— were the only two on which he based his complaint. Johnson Dep., p. 103.

team leader Eric Williams. Then Mr. Williams, Mr. Goad, and Mr. Johnson reported the remark to Melissa Johnson Edgar who served in the company's Human Resources department. Def. Facts, ¶ 16. Mr. Springman apologized to Mr. Johnson and received a three-day suspension for making the comment. Def. Facts, ¶ 17. Mr. Johnson alleges that Mr. Springman served only one day of the three-day suspension. Since Cambridge acknowledges the existence of some doubt about the length of the suspension, we conclude that Mr. Springman served only a one-day suspension. Def. Facts, ¶ 17 (Response, Reply). Still, Mr. Johnson testified that he believed Mr. Springman had been "threatened" by management and was scared about losing his job as a result of making the comment. Def. Facts, ¶ 18. Mr. Johnson is unaware of any other derogatory comments that Mr. Springman may have made after this incident. Def. Facts, ¶ 19.

Co-employee Brian Durham also made racial comments. Mr. Johnson learned about Mr. Durham's comments later from co-employee Vicki Ford (who subsequently married Mr. Johnson). Def. Facts, ¶¶ 20, 21. Mr. Durham said to co-employee Travis Irvine: "I don't know why you want that one-eyed nigger over here," a derogatory reference to Mr. Johnson (and the fact that he had lost all vision in his left eye during childhood). Mr. Irvine reported this statement to team leader Eric Williams, and Mr. Irvine and Mr. Williams then reported it to Human Resources. Def. Facts, ¶ 22, 23; Johnson Dep., p. 170. Mr. Durham left Cambridge's employ several days later. Def. Facts, ¶ 24–25. The parties do not resolve the questions of whether his departure was voluntary or involuntary or whether it was related to his derogatory comment.

### III.  *Discussion.*

#### A.  *The Standard on Summary Judgment*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.,* 150 F.3d 747, 750 (7th Cir.1998).

On a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the nonmovant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment.  *Id.* at 322–23, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265.  "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her."  *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 249–52, 106 S.Ct. 2505, 91 L.Ed.2d 202).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge*, 24 F.3d at 920. Therefore, in considering a motion for summary judgment, we draw all reasonable inferences in favor of the non-movant. *Venters v. City of Delphi*, 123 F.3d 956, 962 (7th Cir.1997). If genuine doubts remain, and a reasonable factfinder could find for the party opposing the motion, summary judgment is inappropriate. See *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Waldridge*, 24 F.3d at 920.

### B. *Statute of Limitations.*

■ Defendant argues that Mr. Johnson's lawsuit was untimely because he failed to file his complaint within ninety days after receiving his Right to Sue Notice ("RTS"). Title VII provides that an aggrieved person must bring a lawsuit within ninety days after the EEOC gives notice that it is not bringing an action in its own name. It is well settled that this "giving of notice" language actually means that the individual has *received* notice, so that the filing period does not begin until the individual (or the individual's counsel) actually receives the RTS Notice. *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 354, 103 S.Ct. 2392, 2398, 76 L.Ed.2d 628 (1983); *Threadgill v. Moore U.S.A., Inc.*, 269 F.3d 848, 850 (7th Cir.2001); *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 532. n. 11 (7th Cir.1993).

■ The RTS Notices (one for each of Mr. Johnson's charges) were sent by EEOC on May 18 and July 11, 2000 respectively. Mr. Johnson's complaint was filed on October 4, 2000, 140 days after the first RTS Notice was mailed and eighty-five days after the second was mailed. Manifestly, the complaint was timely with respect to the second RTS. As to the first Notice, we recognize that there was a long interval between EEOC issuing it and the date on which the complaint was filed. We also note Mr. Johnson's lack of precision as to when he received it. But we will not dismiss a complaint on summary judgment on statute of limitations grounds without clear evidence that the limitations period was in fact exceeded.

■ Since the limitations period begins when the plaintiff *receives* the RTS, we look for persuasive evidence that Mr. Johnson or his lawyer actually received the notice more than ninety days before his complaint was filed. Defendant bears the initial burden of persuasion as to its affirmative defense. *Venters v. City of Delphi*, 123 F.3d 956, 967 (7th Cir.1997); *Law v. Medco Research, Inc.*, 113 F.3d 781, (7th Cir.1997). We will not accept defendant's invitation to base a legal decision as to statute of limitations on a credibility determination or on plausible inferences. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [she] is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In sum, on the record before us, there is a genuine issue of material fact as to when Mr. Johnson received his RTS notice, preventing us from being able to say as a matter of law that he filed his complaint untimely.

C. *Mr. Johnson's Failure to Promote Claim.*

At the heart of Mr. Johnson's lawsuit is the fact that he was denied the team leader position in May 1999 after having been elected to it. Asked at his deposition: "So your complaint is that you didn't get the team leader position in May and that was discriminatory?" Mr. Johnson replied: "Yeah." Johnson Dep., p. 108. Although he seeks to challenge this on summary judgment, he testified that this was the only employment opportunity that he was denied. Asked: "Is there anything else you claim was a denial of an employment opportunity other than the team leader position?" Mr. Johnson responded: "That was it." Johnson Dep., p. 147. This testimony was consistent with statements that Mr. Johnson volunteered during the course of his deposition, many of which point to his complaining about the racial comments of Mr. Springman and Mr. Durham which, Mr. Johnson alleges, led to being denied the team leader position. *See, e.g.,* Johnson Dep., pp. 179–181; p. 185 ("The only thing I lost was that team leader position."). Mr. Johnson testified: "Lost the team leader position over it, over everything that you're saying; that's part of the record." Asked, "It really all comes down to the team leader position, doesn't it?" Mr. Johnson responded: "That and the racial remarks, that's where it all started; that's where everything started." Johnson Dep., p. 188. Mr. Johnson's statements are also consistent with the evidence he presents. That is, except for the team leader position, he presents no evidence of another lost employment opportunity.

It is unclear at the summary judgment stage whether Mr. Johnson is alleging that Cambridge's denial of the team leader position was an act of *discrimination*—it denied him the position because of his race—or an act of *retaliation*—it denied him the position because he and Josh Goad complained to management of Mr. Springman's and Mr. Durham's racially—charged comments. Although Mr. Johnson expressly stated that his not getting the team leader position in May 1999 was the *discriminatory* act of which he complained, Johnson Dep., p. 108, he treats the claim on summary judgment as if it had been an act of *retaliation*.[4] In view of this confusion as to the precise nature of Mr. Johnson's claim at the summary judgment stage, we address the denial of the team leader position under both discrimination and retaliation rubrics.

1. *Mr. Johnson's Race Discrimination Claim.*

A plaintiff may establish a case of race discrimination using either direct or indirect evidence. Where, as here, Mr. Johnson makes no claim to direct evidence, he may proceed indirectly through the burden-shifting method outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Mr. Johnson must first establish a prima facie case. If he does, he raises a presumption of discrimination which the defendant must rebut by producing evidence of a legitimate nondiscriminatory explanation of its adverse em-

---

4. Curiously, Mr. Johnson did not mention Cambridge's rescission of the team leader position in either of his EEOC charges—not the one he filed on November 18, 1999 alleging race discrimination, and not the one he filed on November 26, 1999 alleging retaliation.

ployment action. Once the defendant meets that burden, the plaintiff must establish that the reasons proffered by the defendant were pretextual, by presenting evidence from which a trier of fact may reasonably infer that his race played a role in the challenged action or that the employer offered a phony explanation. *See Freeman v. Madison Metropolitan School Dist.,* 231 F.3d 374, (7th Cir.2000); *Stewart v. Henderson,* 207 F.3d 374, 376 (7th Cir.2000).

To establish a prima facie case of race discrimination, Mr. Johnson must present evidence showing that: (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered an adverse employment action; and (4) a similarly-situated employee, not in his protected class, was treated more favorably. *Gordon v. United Airlines, Inc.,* 246 F.3d 878, 885–886 (7th Cir.2001). Mr. Johnson's discrimination case founders at the prima facie stage. Although Cambridge argues strenuously that Mr. Johnson did not suffer an adverse employment action, we accept for purposes of resolving this motion Mr. Johnson's portrayal and assume that Cambridge's rescission of the team leader position was akin to a failure to promote and, therefore, an adverse employment action.

But Mr. Johnson presents no evidence from which a reasonable trier of fact could infer that at least one similarly-situated white employee was treated more favorably. *Ibarra v. Martin,* 143 F.3d 286, 293 (7th Cir.1998); *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1398 (7th Cir. 1997); *McNabola v. Chicago Transit Authority,* 10 F.3d 501, 513 (7th Cir.1993). The only white employee who appears to

have been similarly-situated is Josh Goad, but Mr. Goad was denied the same promotion at the same time.[5] In sum, Mr. Johnson was treated the *same* as the only similarly-situated white employee with respect to denial of the team leader position.

It follows that Mr. Johnson has presented legally insufficient evidence to raise even a prima facie inference of race discrimination. Nevertheless, we will return to this claim in subpart 3 below, where we discuss the question of whether he has presented evidence from which a jury could reasonably infer that Cambridge's explanation is pretextual.

### 2. *Mr. Johnson's "First" Retaliation Claim.*

Assuming that Mr. Johnson's claim with respect to the team leader position is a retaliation (rather than a discrimination) claim, we distinguish it from his later retaliation charge by referring to it as his "first" retaliation claim. In addition to protecting employees from discrimination based on race, Title VII prohibits an employer from retaliating against an individual who "participates" in statutorily-protected conduct or who "opposes" conduct made unlawful by the statute. 42 U.S.C. § 2000e–3(a). *See, McDonnell v. Cisneros,* 84 F.3d 256, 262 (7th Cir.1996).

In order to prevail on his retaliation claim, Mr. Johnson must show that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is a causal relationship between the protected expression and the adverse action. *Maarouf v. Walker Manufacturing Co.,* 210 F.3d 750, 755 (7th Cir.2000); *Alexander v. Gerhardt*

---

5. Mr. Johnson believes (without supplying any evidence of the fact) that Mr. Goad was promoted to team leader at some point after May 1999. We find Cambridge's evidence that Mr. Goad was *never* promoted to team leader conclusive against Mr. Johnson's mere belief. Wiley Aff., ¶ 2; Def. Ex. G; Kniepkamp. Aff., ¶ 2.

*Enterprises Inc.,* 40 F.3d 187, 195 (7th Cir.1994).

It is clear that Mr. Johnson engaged in statutorily protected expression by complaining about the racial slurs, and we continue to assume that denial of the team leader position was an adverse employment action. Additionally, Mr. Johnson creates a prima facie inference of causation by showing a "telling temporal sequence" of events. *E.g., Horwitz v. Board of Educ. of Avoca School District. No. 37,* 260 F.3d 602, 612–613 (7th Cir.2001). He applied for and was elected to the team leader position, which occasioned racially-derogatory statements by co-employees Springman and Durham, he complained of the statements, and the jobs were rescinded. Absent an explanation of its rescission of the positions, a jury could reasonably infer that the reason was because Mr. Johnson complained about Mr. Springman's and Mr. Durham's racial slurs. In sum, Mr. Johnson satisfies the initial requirements of a prima facie case.

### 3. *Pretext.*

Cambridge has offered a legitimate, non-discriminatory and non-retaliatory explanation of its rescission of the team leader positions. Mr. Johnson testified that Acting Plant Manager Ron Szydlowski told him that Cambridge corporate personnel changed its mind about creating the new positions. According to Mr. Johnson, Mr. Szydlowski told him: "[I]t came down from corporate that there will be no other team leader positions, just the ones that are already appointed previously." Johnson Dep., p. 107. He testified that he did not know *who* at corporate made the decision not to add the two positions, and, perhaps understandably, he did not know whether the company's stated reason was true. Johnson Dep., p. 107.

▮ But Mr. Johnson bears the burden of presenting legally sufficient evidence to raise an inference that the decision maker was prompted to rescind the positions by a retaliatory (or discriminatory) motive. This he has failed to do. There is simply no evidence to suggest that Cambridge has offered anything other than a legitimate non-discriminatory and non-retaliatory reason for its action or that its explanation is dishonest. *Gordon,* 246 F.3d at 888.

It is true, as we previously noted, that under certain circumstances timing alone may create an inference of retaliation. *Horwitz v. Board of Educ. of Avoca School District. No. 37,* 260 F.3d 602, 612–613 (7th Cir.2001); *Silk v. City of Chicago,* 194 F.3d 788, 800–801 (7th Cir.1999). And here we find the timing to be suspicious. In the space of a month—during May, 1999—Cambridge posted the team leader positions, Mr. Johnson applied for one and was elected to it, Messrs. Springman and Durham made their racially derogatory comments, Mr. Johnson and Mr. Goad complained about the comments, and Cambridge rescinded the positions. The sequence is short enough in duration to raise a prima facie inference of retaliation. *E.g. Hunt–Golliday v. Metropolitan Water Reclamation District. of Greater Chicago,* 104 F.3d 1004, 1014 (7th Cir.1997). Had the decision to rescind the positions been made at the facility level—by management at the Rushville plant—we believe the evidence would establish a sufficiently "telling temporal sequence" to raise an inference of retaliation and a triable issue of fact.

▮ But timing alone, even where telling, may not be enough to support an inference of pretext. In *Foster v. Arthur Andersen, LLP,* 168 F.3d 1029, 1034–1035 (7th Cir.1999), the plaintiff showed that she was fired *one day* after asking for a reasonable accommodation for her disabili-

ty. Yet the timing was insufficient to support an inference of pretext. The Seventh Circuit observed that "the temporal sequence analysis is not a magical formula which results in a finding of a discriminatory cause." *Id.* The plaintiff must still show that the employer's explanation for taking the adverse employment action was pretextual so that a jury could reasonably infer a causal connection between the employee's engaging in protected conduct and the adverse action. *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir.1998); *Sanchez v. Henderson*, 188 F.3d 740, 746 (7th Cir. 1999).

Here it is uncontested that the team leader positions were rescinded by some anonymous *corporate* decision maker, not by management at the Rushville facility. Mr. Szydlowski asserted that it was a corporate decision and Mr. Johnson offers no evidence to rebut that assertion. Mr. Johnson acknowledges that he does not know *who* made the decision. Nor does he present any evidence that the decision maker, whoever it was, even *knew* about the racial slurs and about Mr. Johnson's complaint about them. This lack of evidence concerning the decision maker is fatal. As the Seventh Circuit noted in *Maarouf:* "The critical issue here … is whether the person who made the [employment] decision … was aware of the discrimination allegations at the time, because absent such knowledge [the plaintiff] lacks a causal link between the termination and the complaint of discrimination." 210 F.3d at 755. In short, we would have to leap over too many evidentiary gaps to infer from the suspicious timing alone that the anonymous corporate decision maker knew about the racial slurs, knew about Mr. Johnson's complaint, and was motivated to rescind the positions *because* of his complaints or *because* of Mr. Johnson's race. Mr. Johnson bears the burden of persuasion on these factual issues that go to the issue of pretext, but he has not sustained that burden.

D. *Mr. Johnson's Other Race Discrimination Allegations.*

In his first EEOC charge, Mr. Johnson complained that: (1) Cambridge discriminated against him because of his race by assigning to him the more difficult, heavier jobs; (2) coworker Ross Springman had made a racial remark in May, 1999; and (3) on one occasion Materials Manager Dave Hittle had harassed him by telling him to put on his safety glasses. Def. Facts ¶ 6. We postpone discussion of the derogatory statements to our analysis of Mr. Johnson's harassment claim in subpart E below.

1. *Heavier Jobs Assignments and Safety Glass Warning.*

Mr. Johnson alleges that he was singled out for unfavorable treatment on the basis of his race by being assigned to heavier work assignments than white co-employees. Specifically, he alleges that he was assigned to work alone on tasks that white co-employees were assigned to perform in teams of two or more. He also alleges that Materials Manager Dave Hittle harassed him by telling him to put on his safety glasses. Def. Facts ¶ 6. To be "singled out" for unfavorable treatment is, of course, the very embodiment of "disparate treatment." *Doe by Doe v. City of Belleville, Ill.,* 119 F.3d 563, (7th Cir.1997), *vacated on other grounds, City of Belleview v. Doe by Doe,* 523 U.S. 1001, 118 S.Ct. 1183, 140 L.Ed.2d 313 (1998). When it is based on a criterion such as race, it is unlawful. When it persists it may constitute harassment.

Although we accept Mr. Johnson's assertions that he handled heavier work as-

signments than other employees, and that Mr. Hittle warned him to put his safety glasses on, Mr. Johnson has presented legally insufficient evidence to support the claim that he was assigned the heavier tasks and told to wear his safety glasses *because of his race.*

■ As to the assignments, in his deposition testimony Mr. Johnson vacillates between depicting the heavier assignments as a sign of race discrimination and bragging about them as a sign of his superior abilities. Mr. Johnson undermines his race claim (and certainly the broader suggestions of pattern and practice discrimination that characterize his summary judgment brief) by testifying that he was the *only* production employee who worked on the heavier assignments alone, so that no other African American employees were assigned to work on them alone. Johnson Dep., pp. 121–125, 129–130. He also testified that he was able to accomplish more working alone than teams of other employees could achieve and that his superior work performance would have been a good reason for Mr. Wiley to assign him to work alone. Johnson Dep., 136–138, 139. He also testified that he worked better by himself. Johnson Dep., p. 102.

Even if we assume that Mr. Johnson's evidence were sufficient to raise a prima facie inference of discrimination or harassment—he was assigned to work alone on projects that were ordinarily undertaken by teams of employees—it would be unreasonable to infer from the evidence that the reason for making such assignments was race. Where, as here, the plaintiff agrees that he got the job done by himself, that he worked better by himself, and that it was understandable that Mr. Wiley would assign him to work alone because of his

abilities, a jury could not reasonably infer that the explanation was a pretext for race discrimination or that assignments were a form of harassment.

■ Nor could a jury reasonably infer that Mr. Hittle singled out Mr. Johnson for unfavorable treatment by warning him to wear safety glasses. Mr. Johnson acknowledges that wearing safety glasses is a company work requirement. He also acknowledges that Mr. Hittle "came up and just told me, put my glasses on before I lose that other eye...." Johnson Dep., p. 170. Even if, as Mr. Johnson alleges, Mr. Hittle had just come from a group of white employees who were not wearing safety glasses, we could not infer, based solely on his caution to Mr. Johnson, that he was singling out Mr. Johnson for unfavorable treatment.[6]

In sum, Mr. Johnson has presented legally insufficient evidence that he was the victim of race discrimination in that the terms and conditions of his employment were, because of his race, less favorable than those of similarly-situated white employees.

E. *Mr. Johnson's Harassment Claim.*

In addition to protecting employees from disparate treatment based on unlawful criteria, Title VII also prohibits employers from creating, condoning, or tolerating a hostile work environment. A "hostile" work environment is one that is "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Shanoff v. Illinois Dept. of Human Services,* 258 F.3d 696, 704 (7th Cir.2001) (in-

---

**6.** We give this action by Mr. Hittle the favorable spin to which Mr. Johnson is entitled at this stage of the proceedings, but note that

Mr. Hittle's gesture could be interpreted just as reasonably as an expression of kind solicitousness with regard to Mr. Johnson's safety.

ternal citations omitted); *Adusumilli*, 164 F.3d at 361. The issue of whether the work environment is hostile "turns on whether the alleged harassment occurred because of the [race] of the complainant." *Haugerud v. Amery School District*, 259 F.3d 678, 692 (7th Cir.2001). In other words, the question is whether the employee was " 'exposed to disadvantageous terms or conditions of employment to which members of the other [race were] not exposed.' " *Id. quoting Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)

█ Proof of hostile environment is two pronged. In order to prevail, the plaintiff must present evidence sufficient to raise a reasonable inference that he *subjectively* experienced the environment to be abusive; he must also show, *objectively*, that a reasonable person in his position also would have perceived it to be hostile. *Haugerud*, 259 F.3d at 693; *Adusumilli*, 164 F.3d at 361. In order to determine whether the work environment is *objectively* hostile, we consider all of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Haugerud*, 259 F.3d at 693.

Since the Supreme Court's clarifying decisions in 1998, analysis of employer liability for hostile environment harassment has depended upon whether the harassment was committed by a supervisor or by a co-worker and whether or not the harassment culminated in a tangible employment action. *Burlington Industries v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

In analyzing whether Mr. Johnson was subjected to a racially hostile work environment, we ask whether all of the incidents he enumerates, considered cumulatively, would constitute sufficient evidence for a jury to infer race harassment. *Silk v. City of Chicago*, 194 F.3d 788, 807–808 (7th Cir.1999); *Sweeney v. West*, 149 F.3d 550, 556–557 (7th Cir.1998); *Galloway v. General Motors Service Parts Operations*, 78 F.3d 1164, 1166 (7th Cir.1996). We find that they do not.

Mr. Johnson enumerates the following incidents in support of his hostile environment claim:

- Mr. Johnson was subjected to racially derogatory remarks made by Ross Springman and Brian Durham.
- Mr. Szydlowski ordered him to sit down while Mr. Szydlowski gave Mr. Johnson a document enumerating instances of Mr. Johnson's allegedly poor conduct at work. Johnson Dep., pp. 175–178. He also told Mr. Johnson that he would not hesitate to fire him for insubordination. Johnson Dep., p. 182.
- Mr. Hittle told Mr. Johnson to put on his safety glasses. Johnson Dep., p. 170.
- Mr. Szydlowski ordered him to get off the phone and get back to work while Mr. Johnson was using the phone during a break. Johnson Dep., pp. 185–188.
- Mr. Wiley assigned him heavier jobs than similarly-situated white employees. Johnson Dep., 121–125, 129–130.

### 1. *The Derogatory Comments.*

█ It is uncontested that co-employees Ross Springman and Brian Durham used racially derogatory expressions in May 1999. It is also uncontested that both were co-employees and not management. Where, as here, the alleged harassment was committed by co-employees, the em-

ployer is not subject to strict liability. Instead, Mr. Johnson must show that Cambridge was negligent in order to hold it liable for co-worker harassment. *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir.1998), *cert. denied*, 528 U.S. 988, 120 S.Ct. 450, 145 L.Ed.2d 367 (1999). In other words, an employer is liable where it knows or should know of the harassment and fails to take prompt remedial action. *Savino v. C.P. Hall Co.*, 199 F.3d 925, 933–934 (7th Cir.1999).

■■■ Even assuming that the derogatory comments rise to the level of harassment, it is clear that, when notified of them, Cambridge counseled both Mr. Springman and Mr. Durham. Mr. Springman apologized. Additionally, Mr. Johnson acknowledges that Mr. Springman appeared concerned that he might lose his job over the incident. Def. Facts, ¶ 18. Mr. Johnson acknowledges that he is unaware of any other racially derogatory comments that Mr. Springman may have made after the remark of May 1999. Def. Facts, ¶ 19. Mr. Durham's employment was terminated within a few days (although we do not know whether he was fired or he resigned). Mr. Durham's departure, for whatever reason, served the salutary purpose of removing a racial troglodyte from the work place so that his remarks would never be repeated.

In other words, even assuming that the comments of May 1999 rose to the level of actionable harassment, Cambridge took appropriate action to prevent a recurrence of such incidents. The Seventh Circuit recently reiterated:

> If an employer takes reasonable steps to discover and rectify the harassment of its employees . . . it has discharged its legal duty. An employer's response to alleged instances of employee harassment must be reasonably calculated to prevent further harassment under the

particular facts and circumstances of the case at the time the allegations are made. We are not to focus solely upon whether the remedial activity ultimately succeeded, but instead should determine whether the employer's total response was reasonable under the circumstances as then existed. The reasonableness of an employer's response depends, in part, on the gravity of the harassment alleged.

*Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir.2001), *quoting*, *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 480 (7th Cir.1996).

### 2. *The Other Incidents.*

■■■ We have already discussed the safety glasses incident and the heavier jobs. As to Mr. Szydlowski ordering Mr. Johnson to sit down and threatening Mr. Johnson that he would not hesitate to fire him for insubordination, Mr. Johnson did *not* in fact sit down; instead, he walked out of the office, and was not fired for insubordination or for anything else. Johnson Dep., pp. 182–183. While we have no reason to doubt that Mr. Johnson found these other enumerated incidents to be subjectively distressing and believed that they were based on his race, they are, *objectively*, so innocuous as to fall well below the threshold of what the law regards as hostile environment harassment. That is, they were not sufficiently severe or pervasive as to alter the terms and conditions of Mr. Johnson's employment. *See, Haugerud*, 259 F.3d at 693; *Silk*, 194 F.3d at 808; *Baskerville v. Culligan International Co.*, 50 F.3d 428 (7th Cir.1995).

### F. *Mr. Johnson's "Second" Retaliation Claim.*

In his second EEOC charge, Mr. Johnson alleged that he was the victim of retaliation for having complained about the ra-

cial incidents and having filed the first charge. *In addition* to the incidents enumerated in sub-section E above, Mr. Johnson also alleges that the following incidents and events support his retaliation claim.

● Mr. Johnson alleged in his charge that Cambridge refused to provide a back brace that he required and that was ordered by his physician for a work related injury.

● He also alleged in his charge that a physician also prescribed pain medication, but that he was not permitted to use it while on the job.

● On January 20, 2000 and again on February 2, 2000, Mr. Szydlowski gave to Mr. Johnson two, substantially identical, formal Notifications of Unsatisfactory Conduct. The January notice enumerated twelve instances of unsatisfactory conduct and the February notice enumerated nine. Def. Ex. 34; Pl. Ex. "EEOC Resp. to FOIA Req.," 68.

● Mr. Johnson was given an employee vacation warning. Mr. Johnson claims that Cambridge took away vacation days on the theory that he had taken more vacation than he as entitled to. Mr. Johnson alleges that Cambridge's claim is false.

We have already set forth the criteria for a retaliation claim. We note here that Mr. Johnson's retaliation claim is fatally defective in two ways. First, none of the incidents, nor all of them together, rise to the level of an adverse employment action. Second, he provides us no reason to link the events causally to his complaint of discrimination.

Since the Supreme Court's decisions in *Burlington Industries v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the courts have consistently adhered to the view that an adverse employment action (whether in a harassment or retaliation case) is one that causes a substantial change in employment. The Supreme Court has stated that: "A tangible employment action constitutes a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits." *Ellerth*, 118 S.Ct. at 2268 (emphasis added). *See Savino v. C.P.Hall Company*, 199 F.3d 925, 933 (7th Cir.1999). In *Silk v. City of Chicago*, 194 F.3d 788, 807–808 (7th Cir.1999) the Seventh Circuit, refusing to find an adverse employment action for purposes of harassment or retaliation claims, stated:

[Sergeant Silk] has alleged no demotion in rank, no diminution of salary. He has continued to do his job without impediment from the harassing actions of others. .... Sergeant Silk failed to demonstrate that the workplace was permeated with discriminatory conduct—ridicule, intimidation, insult—that was sufficiently severe or pervasive to alter the conditions of his employment.... In the end, his claims fail because he cannot prove that he suffered a materially adverse action. We hold that the district court was correct in granting summary judgment "[b]ecause of the lack of support for either a harassment or retaliation theory under the ADA or the Rehabilitation Act."

■ Mr. Johnson focuses considerable attention on the notices of unsatisfactory conduct. In *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 729–730 (7th Cir.2001), the Seventh Circuit reiterated that: "unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions." *See Sweeney v. West*, 149 F.3d 550, 556–557 (7th Cir.

1998); *Smart v. Ball State University*, 89 F.3d 437, 442 (7th Cir.1996). Although Mr. Johnson argues that the notices were fabricated for the purpose of generating a paper trail that could be used to justify his termination, the fact remains that Mr. Johnson has not been terminated. In fact, the record is devoid of any evidence that might raise an inference that he has been materially deprived of any employment benefit or opportunity.[7]

 As to the back brace, Cambridge asserts that it could not issue Mr. Johnson a back brace until he revealed the size he needed. Once he revealed the size, one was provided. As to the pain medication, Mr. Johnson acknowledges that Cambridge has a policy which prohibits employees from using prescription medications when the medications might present a work hazard. There is no evidence to support an inference that either of these explanations by Cambridge is either pretextual or based on race.

### IV. *Conclusion.*

This is one of those cases which exemplify the toxicity of racial slurs in the work place. Once aired, their poison tends to infect the victim with understandable suspicion about the employer's motives as to almost any practice, no matter how innocuous. The law of discrimination, harassment, and retaliation, however, requires more than suspicion, no matter how justifiable. It requires evidence from which a reasonable trier of fact may infer a discriminatory or retaliatory motive. Mr. Johnson has failed to adduce enough evidence to meet that threshold requirement.

Accordingly, we GRANT Cambridge's motion for summary judgment and dismiss plaintiff's complaint, pursuant to Fed. R.Civ.P. 56.

It is so ORDERED this day of January 2002.

---

7. With respect to the loss of vacation pay, plaintiff may not simply say that Cambridge's statement that Mr. Johnson had used too much vacation is "false." Mr. Johnson has the burden of raising an inference of pretext. Accordingly, he must show that the explanation is *dishonest.* A false belief, honestly held, is not a pretext. *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir.2001); *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir.2000).