Fernand L. FORTIER, III,
Plaintiff–Appellant,

v.

AMERITECH MOBILE COMMU-
NICATIONS, INCORPORAT-
ED, Defendant–Appellee.

No. 98–1023.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 9, 1998.

Decided Dec. 3, 1998.

William J. Harte (argued), Courtney Carlton Nottage, Harte & Associates, Chicago, IL, for Plaintiff–Appellant.

David B. Ritter (argued), Altheimer & Gray, Chicago, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, and RIPPLE and DIANE P. WOOD, Circuit Judges.

RIPPLE, Circuit Judge.

Fernand L. Fortier ("Mr.Fortier") seeks review of the district court's decision to grant the motion for summary judgment of Ameritech Mobile Communications, Inc. ("Ameritech") as to Mr. Fortier's discriminatory discharge claims under the ADEA and Title VII (Counts I and II) and his retaliatory dis-

charge claim under Title VII (Count III).[1] For the reasons set forth in the following opinion, we affirm the judgment of the district court.

## I

## BACKGROUND

### A. Facts

Ameritech provides cellular telephone, paging and other communications services in several Midwestern states. In 1990, Mr. Fortier transferred to the position of Manager of Staffing and Equal Employment Opportunity (EEO) at Ameritech. In the three years preceding his transfer, Mr. Fortier had received positive evaluations for his job performance in other positions with the Ameritech companies. Notably, from February 1990 until April 1992, Mr. Fortier reported to Jim Riecks, the Director of Human Resources. In a performance review for 1991, Riecks determined that Mr. Fortier met "expectations for most or all job accountabilities." R.26 at 3.

In April 1992, Mr. Fortier began to report directly to Mary Aguiña–Tudela ("Aguiña–Tudela"), the Vice President of Human Resources. Around the same time, Aguiña–Tudela reorganized the human resources department and, as part of this reorganization, assigned Mr. Fortier the responsibility of developing a new safety and security function. As part of this alteration in responsi-

bilities, Aguiña–Tudela also changed Mr. Fortier's job title to Assistant Director of EEO, Safety and Corporate Security and removed his staffing responsibilities. Mr. Fortier retained his previous EEO responsibilities. There was no alteration in his compensation and salary grade.

In November 1992, Aguiña–Tudela made a further change. She assigned Mr. Fortier's EEO responsibilities to Paulette McCann ("McCann"), a 26–year–old woman, and changed Mr. Fortier's job title to Assistant Director of Safety and Security. Aguiña–Tudela told both Mr. Fórtier and McCann that she wanted a woman in the EEO position because she believed that female employees would feel more comfortable discussing sexual harassment complaints with a woman. She also told Mr. Fortier, who was 42 years old at the time, that she thought it was time for "new blood" and that McCann "had a lot of energy" and would be a "quick study."

When Aguiña–Tudela began supervising Mr. Fortier in April 1992, she noticed various deficiencies in his job performance. According to her, Mr. Fortier was often late in reporting to work and in completing assignments; he was unresponsive to her requests and instructions; and he persistently lacked the necessary attention to administrative details. Mr. Fortier disputes these characterizations of his performance.[2] According to Aguiña–Tudela, she counseled Mr. Fortier

---

1. Count IV, based on the supplemental jurisdiction of the district court over related state claims, was dismissed by the district court. Mr. Fortier does not appeal the grant of summary judgment as to the retaliation claim (Count III).

2. The record lists numerous examples of Mr. Fortier's failure to complete assignments, to show up for meetings, or to follow instructions, even after repeated reminders. These incidents are documented in Aguiña–Tudela's deposition and affidavit and in various interoffice memoranda that were introduced as exhibits for purposes of the summary judgment motion.

For example, Aguiña–Tudela alleges that, before she began supervising Mr. Fortier, she asked him to prepare a report on Ameritech's compliance with OSHA. After receiving no response from Mr. Fortier for three weeks, Aguiña–Tudela was forced to seek him out, and when he did not provide a sufficiently detailed response, she had to request additional information from him three separate times over the following two months. Mr. Fortier denies that his responses were unac-

ceptable or incomplete and claims that he submitted a memorandum concerning OSHA status to Aguiña–Tudela on May 22, 1992 (after the two-month period during which Aguiña–Tudela sought the information).

On another occasion, Mr. Fortier was assigned to follow up on the recommendations made by the legal department to revise Ameritech's OSHA policy statement. Although he promised to complete a draft of the policy statement by April 15, 1992, the draft was still not completed by May 4. Mr. Fortier admits that he had agreed to provide the draft by April 15 but did not do so until May 14.

Aguiña–Tudela further alleges that on July 22, 1992, Mr. Fortier forgot to show up for a scheduled meeting with her to discuss his Management By Objectives planning for the year. The meeting was rescheduled for the next morning, but Mr. Fortier called in to report that he would be late that day. When the meeting finally took place, Mr. Fortier agreed to develop his objectives and to provide them to Aguiña–Tudela by

numerous times on the areas needing improvement.[3] Aguiña–Tudela also testified that Mr. Fortier lied to her on three occasions regarding his whereabouts when he arrived late for work.[4]

In February 1993, Aguiña–Tudela completed Mr. Fortier's annual performance review for 1992; she gave him the lowest rating possible. Aguiña–Tudela stated that Mr. Fortier was deficient in organization, planning, administration and basic management judgment. She noted that Mr. Fortier was unreliable in the area of accessibility and timeliness and that his follow-up on projects

July 29. However, he did not provide her with his objectives on the agreed date. Fortier denies this allegation but offers in response only that he did not forget the meeting and that it was originally rescheduled due to a conflict.

Mr. Fortier was assigned to train Ameritech officers in new and enhanced security measures implemented during the company's workforce resizing program that resulted in employee layoffs. Although Mr. Fortier gave each officer a preliminary briefing about the new security measures, Aguiña–Tudela alleges that he never provided the follow-up training, despite directions to do so. Mr. Fortier denies this allegation without explanation.

Aguiña–Tudela further alleges that, due to the workforce resizing program, Mr. Fortier was instructed not to approve the termination of any employee outside of the program. Despite this clear directive, Mr. Fortier approved the termination of four employees during August 1992. Mr. Fortier denies that he was instructed not to approve any terminations. He further alleges that only one termination took place during the relevant time period, and that his decision was made in consultation with three other department members.

In early September 1992, Mr. Fortier agreed to develop an outline relating to supervisory training. According to Aguiña–Tudela, however, he failed to produce the outline and had to be reminded about the project seven times during the subsequent few months. Mr. Fortier alleges that he did in fact develop the training content as assigned.

Aguiña–Tudela assigned Mr. Fortier the task of creating an outline of information regarding the expenditures necessary for compliance with the ADA and specifically indicated that she needed the information by September 15 in order to develop a report for Ameritech's officers. According to Aguiña–Tudela, as of September 24, Mr. Fortier had not produced the outline, and contrary to Aguiña–Tudela's explicit directions, Mr. Fortier eventually sent the outline directly to Ameritech's president without her review. Mr. Fortier alleges that the outline was prepared and sent to the president under the direction of Riecks, who Mr. Fortier thought had been given authority from Aguiña–Tudela to send the outline to the president.

On October 8, 1992, Aguiña–Tudela asked Mr. Fortier to complete a status report on Ameritech's ADA compliance. Having received no response from Mr. Fortier, Aguiña–Tudela alleges, she made additional requests on five separate occasions over the next month. By November 24, Aguiña–Tudela still had not received Fortier's report. Mr. Fortier admits being assigned this task but alleges that the corporate office advised him that the information Aguiña–Tudela asked for was not needed.

Aguiña–Tudela also alleges that Mr. Fortier failed to address simple, administrative matters in a timely fashion. For example, his vacation carry-over form was due on December 18, 1992. On January 19, 1993, he had not submitted the form and was told to submit it to Aguiña–Tudela by the next day. He did not turn in the form until mid-February. Mr. Fortier admits these allegations but claims that Aguiña–Tudela's assistant had no need for the form except to put it in her file and that the company suffered no harm from the delay.

The record contains additional similar examples of Mr. Fortier's performance deficiencies.

3. Aguiña–Tudela claims that, in addition to her written admonitions, she verbally coached and counseled Mr. Fortier at least fifty times regarding his lack of attention to administrative detail. Mr. Fortier denies that Aguiña–Tudela verbally coached and counseled him no less than fifty times and claims that "[w]hile Aguina was occasionally angry about some perceived failure on my part, upon explanation she usually understood that she had been mistaken." R.30, Ex.1, at ¶ 20. Mr. Fortier also asserts that Aguiña–Tudela's claim is not substantiated by any documentation in the record, although she was required by the Written Counseling Statement Procedures to "document all disciplinary incidents, even informal warnings and counseling regarding small infractions and minor performance problems." R.31 at Tab M.

4. Aguiña–Tudela claims that Mr. Fortier twice told her that he arrived in his office late because he was meeting with a company manager. Both times, Aguiña–Tudela contacted the specific manager and was informed that no meeting had taken place. On another occasion, Aguiña–Tudela personally witnessed Mr. Fortier arrive late at Ameritech's parking facility. When she asked him about his tardiness later that day, he denied that he was late and said he had been in the building at 8:00 a.m. on another floor. When Aguiña–Tudela told him that she had personally observed him come into the building late, Mr. Fortier had no response.

Mr. Fortier denies that he lied to Aguiña–Tudela on these three occasions, but offers no further explanation.

was unsatisfactory. Mr. Fortier disputes Aguiña–Tudela's evaluation of his performance, claiming that she failed to consider his positive accomplishments, which he had listed on a Performance Appraisal Input submitted to Aguiña–Tudela prior to her evaluation. He also points out that Riecks was his supervisor for the first three months and final two months of the year. Although Aguiña–Tudela admitted that Riecks was in the best position to evaluate Mr. Fortier during the last two months of the year, Riecks did not recall whether Aguiña–Tudela consulted him when preparing Mr. Fortier's review and did not recall Mr. Fortier's performance being more or less than satisfactory during those two months. Finally, Mr. Fortier notes that Aguiña–Tudela kept the performance file containing her notes on his performance, although her standard practice was to destroy such a file after writing the performance review.

Aguiña–Tudela testified in her deposition that she decided to terminate Mr. Fortier in mid-March because of his deficient performance. Aguiña–Tudela sent Mr. Fortier a letter on March 30, 1993, informing him that he was being terminated as part of Ameritech's workforce "resizing" program. Upon hearing the news of his termination, Mr. Fortier sent a memorandum to Aguiña–Tudela and McCann in which he complained that his performance review did not accurately reflect his performance. He wrote: "I believe that the appraisal and other criteria related to my employment, have been administered in a discriminatory way, on the basis of factors prohibited by law." R.27, Tab B, Ex.10. According to Ameritech, Mr. Fortier was ultimately terminated for poor performance, rather than under the workforce resizing program.

After Mr. Fortier's termination, McCann temporarily assumed Mr. Fortier's safety and security duties. She successfully performed the safety function for one and a half months and the security function for approximately five months.

**B. Holding of the District Court**

On December 4, 1997, the district court granted summary judgment for Ameritech on Mr. Fortier's age and gender discrimination claims and on his retaliatory discharge claim. The district court emphasized that, to survive summary judgment, the nonmoving party must do more than show either the "mere existence of a scintilla of evidence" in support of his position or "some metaphysical doubt" as to the material facts. Relying on *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir.1996), the district court determined that Aguiña–Tudela's statements about her preference for a woman in the EEO job did not constitute *direct* evidence sufficient to raise a genuine issue of fact as to discriminatory intent because these remarks were made in the context of transferring Mr. Fortier's EEO responsibilities to McCann, not in the context of the decision to terminate Mr. Fortier.

The district court further held that Aguiña–Tudela's statements at the time Mr. Fortier was relieved of his EEO responsibilities did not constitute *circumstantial* evidence sufficient to raise a genuine issue of fact as to discriminatory intent because there was no causal nexus between her remarks and Mr. Fortier's termination. Not only were the remarks temporally removed from the termination (by five months), but the remarks also did not exhibit discriminatory animus toward Mr. Fortier.

Turning to the indirect method of establishing a case of either age or gender discrimination under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), method of proof, the district court also held that Mr. Fortier had failed to raise a genuine issue of fact as to whether his performance met Ameritech's legitimate expectations. The district court determined that Mr. Fortier's prior evaluations, his own self-assessment, co-workers' assessments, and Riecks' informal evaluation of Mr. Fortier's 1992 performance were insufficient to raise a genuine issue of fact as to the validity of Aguiña–Tudela's evaluations.

**II**

**DISCUSSION**

**A.**

■ Mr. Fortier first submits that the district court erred because Aguiña–Tudela's statement that she wanted a woman in the

EEO position, coupled with his replacement by a female in that position and his eventual termination, provide direct evidence of gender discrimination that precludes a grant of summary judgment. In Mr. Fortier's view, the statements here, unlike those in *Geier*,[5] are causally related to her decision to terminate him. In his view, relieving him of these responsibilities was the "beginning of the end" of his career at Ameritech. He stresses that EEO work was his area of expertise. When he was relieved of these responsibilities, he was left with only the new safety and security function. He relies primarily on the unpublished decision in *Talbott v. Empress River Casino Corp.*, No. 95 C 5317, 1996 WL 400033 (N.D.Ill. July 15, 1996), in which a supervisor's discriminatory remarks, made

eleven months before the decision to terminate, were determined to be probative of discriminatory intent.[6] The district court's characterization of Aguiña–Tudela's remarks as exhibiting only an "improper gender stereotype," does not recognize appropriately, he submits, that the remarks evince the sort of workplace bias that Title VII was meant to eliminate.

 We believe that the district court was correct in concluding that summary judgment was appropriate with respect to the sex discrimination claim. At the outset, it is important to keep in mind that the adverse employment action of which Mr. Fortier complains in this action is his termination from Ameritech, not the change of his responsibilities five months earlier.[7] Unlike

---

**5.** In *Geier v. Medtronic, Inc.*, 99 F.3d 238 (7th Cir.1996), we affirmed the district court's grant of summary judgment for the defendant employer in a sex discrimination suit, concluding, in pertinent part, that a supervisor's isolated comments did not constitute direct evidence of pregnancy discriminatıon because they were not "contemporaneous with the discharge or causally related to the discharge decision making process." *Id.* at 242. During a casual conversation about Geier's family plans while on a long car trip, Geier's supervisor had told her, "Have all the kids you would like—between spring, summer, and fall. I will not work your territory during the winter months." *Id.* The court found that, even when viewed in the light most favorable to Geier (as revealing of the supervisor's bigoted views toward pregnancy) the supervisor's comments were not probative of discrimination. The comments lacked both a temporal relationship to and a causal nexus with the decision to discharge because they were made one year prior to the termination and in a setting unrelated to discussions of Geier's deficient work performance, which ultimately led to her dismissal. *See id.*

**6.** In *Talbott*, the district court denied the defendant employer's motion for summary judgment on a sex discrimination claim, finding, in pertinent part, that comments made by the plaintiff's supervisor were probative of discriminatory intent in the termination decision, even though they were temporally removed from the decision to terminate. *See Talbott*, 1996 WL 400033, at *15, 17.

The plaintiff, Ms. Talbott, was employed by Empress River Casino Corp. as Senior Director of Human Resources and Support Services. She contended that various remarks by General Manager Brown, one of her supervisors, constituted circumstantial evidence of discriminatory intent in his decision to demote and ultimately to terminate her. First, on March 28, 1994, Brown allegedly called Talbott a gender-specific deroga-

tory name while reprimanding her for undermining his authority by conducting a meeting with another director in her office. See *id.* at *4. Second, during a May 1994 performance review in which Brown and the company president informed Talbott that she was being demoted, Brown again addressed the issue of Talbott's inappropriate meeting. He told Talbott that she had to be "more like one of the boys" and suggested that she go out for drinks with one of the other directors. *Id.* at *5 (internal quotation marks omitted). In January 1995, Brown and the company president each gave Talbott a very poor performance review, and Talbott was terminated the following month.

The district court first rejected the argument that the two comments were not gender biased and then held that the comments were probative of Brown's discriminatory motive in terminating Talbott, despite their temporal removal from the termination decision. The district court reasoned that Brown had apparently considered the March 28, 1994 event, which spawned both discriminatory comments, when deciding to demote her in May 1994 and when writing her January 1995 performance review, which led to her termination the following month. Thus, in the court's view, it was "reasonable to infer that Brown's discriminatory motive was a motivating factor in demoting Talbott and placing her on the precipice of termination." *Id.* at *15. The court also found it reasonable to infer that, absent Brown's discriminatory motive, Talbott would not have been terminated in February 1995 and thus denied Empress' motion for summary judgment on the sex discrimination claim.

**7.** Indeed, Mr. Fortier does not maintain that the removal of his EEO responsibilities constituted an adverse employment action. Under our precedent, "a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an

the situation in *Geier*,[8] Aguiña–Tudela's comment about the need for a woman in the EEO position can be characterized as performance-based and therefore might be probative of the employer's discriminatory intent if sufficiently related, causally or temporally, to the adverse employment action under scrutiny. However, this remark, made in the context of transferring Mr. Fortier's EEO duties to McCann, is not sufficiently related, either logically or temporally, to the termination decision and therefore is not probative of Ameritech's intent at that time. Aguiña–Tudela's comment about wanting a woman in the EEO position was related to *an* employment decision, but not to one that, on this record, was tied to the ultimate termination decision. Therefore, this remark cannot constitute, without more, direct evidence of discrimination.[9]

■ In other contexts, there most certainly will be circumstances in which evidence surrounding a previous employment decision such as a demotion would be relevant to and probative of an employer's intent in a subsequent termination decision. In *Mathewson v. National Automatic Tool Co.*, 807 F.2d 87 (7th Cir.1986), for example, this court held that evidence showing discriminatory intent in the plaintiff's demotion was probative of discriminatory intent in the plaintiff's subsequent termination. The court reasoned that the evidence surrounding the two employment actions was sufficiently linked because the employer had relied on the same (arguably pretextual) reasons in deciding to demote and to terminate the plaintiff. The court noted that, although the lapse of time between the discriminatory demotion and the termination may reduce the weight of the evidence in proving discriminatory termination, the overall evidence was sufficient to support the jury's verdict in favor of the plaintiff. *See id.* at 91. Similarly, in *Sennello v. Reserve Life Insurance Co.*, 872 F.2d 393 (11th Cir.1989), the plaintiff, who brought claims for both demotion and termination, was allowed to use evidence of discrimination in demotion to support a claim of discrimination in termination, because the two employment actions were intertwined. The district court therefore considered the same evidence in determining that both the plaintiff's demotion and her termination less than two months later were motivated by gender discrimination. On appeal, the Eleventh Circuit rejected the defendant's contention that the demotion and termination were legally dis-

---

alteration of job responsibilities." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* "Not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996). However, adverse job actions can include changes that do not involve quantifiable losses in pay or benefits. For example, in *Collins v. Illinois*, 830 F.2d 692, 703–04 (7th Cir.1987), an adverse job action was found when an employee was moved to a new department where her supervisors did not even know what her job entailed, she lost her office, phone, and business cards, and she was assigned to a receptionist-type desk. Also, in *Dahm v. Flynn*, 60 F.3d 253 (7th Cir.1994), this court held that "decreasing some job responsibilities while increasing other duties can, under limited circumstances, constitute an adverse employment action" and that "a dramatic downward shift in skill level required to perform job responsibilities can rise to the level of an adverse employment action." *Id.* at 257, 258. Similarly, terminating supervisory authority over other em-

ployees could constitute an adverse employment action. *See id.* at 258–59.

In Mr. Fortier's case, his compensation and salary grade remained unchanged, and there is no evidence that his office space changed. He did not lose supervisory authority over other employees. (His staffing responsibilities, which involved supervision of two to four corporate recruiters, had been removed at a previous time not at issue in this suit.) There is no evidence that the job responsibilities that Mr. Fortier was left with (safety and security) required less skill than his previous combination of duties. In fact, when he was first given the safety and security function, it was viewed as an opportunity for advancement in the company.

8. In *Geier*, the supervisor's comments were made in a context completely unrelated to any discussion of the employee's work performance or employment status; the court found the remarks causally unrelated and thus not probative of discriminatory intent. *See Geier*, 99 F.3d at 242.

9. We shall assume, without deciding, that sex is not a bona fide occupational qualification for the EEO position. Neither party has suggested that it is, and the matter has not been briefed in this case.

tinct claims that must be considered separately. *See id.* at 395. Such circumstances, however, are not before us today.

### B.

■ We now turn to the second issue tendered by Mr. Fortier—whether the district court ignored direct evidence of age discrimination. In Mr. Fortier's view, Aguiña–Tudela's statements provide direct evidence of age discrimination. He contends that her statement that "new blood" would be good in the position, and that Mr. Fortier's younger replacement had a "lot of energy" and would be a "quick study," coupled with the fact that Mr. Fortier was terminated at age 42 and was replaced by a 26–year–old, raise genuine issues as to whether his termination was caused by discrimination based on age.

We cannot accept this argument. First, as we already have noted, Aguiña–Tudela's comments, made in the context of relieving him of his EEO duties some five months before he was terminated, are not probative of discriminatory intent in the employment decision at issue in the case—Mr. Fortier's termination. Moreover, Aguiña–Tudela's comments do not even reflect age bias. Standard usage and common sense dictate that "energetic" means active, "quick study" means bright, and "new blood" means a change. These comments, whether reviewed in the abstract or in the context of this case, simply cannot support a determination of age bias. *See Blackwell v. Cole Taylor Bank,* 152 F.3d 666, 671 (7th Cir.1998) (stating that employer's concern that certain employees were not "flexible" or "energetic" is not evidence of age discrimination); *Richter v. Hook–SupeRx, Inc.,* 142 F.3d 1024, 1032 (7th Cir.1998) (holding that employer's statements that employee had a "low energy level" and was "resistant to change" did not raise an inference of age discrimination); *see also EEOC v. Clay Printing Co.,* 955 F.2d 936, 942 (4th Cir.1992) (holding that statements referring to "young blood" are not probative of age discrimination or a discriminatory purpose); *Gagne v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 314 (6th Cir.

1989) (holding that a supervisor's statement that he "needed younger blood" was insufficient to create a genuine issue of material fact regarding age discrimination).

### C.

Mr. Fortier's case fares no better when it is assessed under the *McDonnell–Douglas* indirect method of establishing discrimination. As is often the case, this inquiry focuses on one element of the prima facie case—whether the employee was fulfilling the legitimate performance expectations of the employer—and on whether, assuming that a prima facie case can be made, the reasons given by the employer for the discharge are pretextual. As is also often the case, there is a great deal of overlap with respect to the factual inquiry relevant under these two prongs. *See Denisi v. Dominick's Finer Foods, Inc.,* 99 F.3d 860, 864 (7th Cir.1996).

■ The record indicates that Mr. Fortier had received positive performance evaluations in the years prior to Aguiña–Tudela's negative evaluation; we must keep in mind, however, that the relevant time to consider is the time of discharge. *See Hong v. Children's Mem'l Hosp.,* 993 F.2d 1257, 1262 (7th Cir.1993), *cert. denied,* 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994) ("The critical issue is whether [the employee] was performing well in her job at the time of her termination."). Although, in some circumstances, previous employment history may be relevant and probative in assessing performance at the time of termination,[10] its limited utility must also be recognized. Certainly, earlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken. *See id.* at 1267. Nor can such evaluations, standing alone, create a genuine issue of triable fact when, as here, there have been substantial alterations in the employee's responsibilities and supervision in the intervening period.

---

**10.** *See Denisi,* 99 F.3d at 865 (noting that earlier poor evaluations supported adverse performance evaluation at the time of discharge); *Giacoletto v. Amax Zinc Co.,* 954 F.2d 424, 426–27 (7th Cir.

1992) (noting that jury was entitled to consider earlier evaluations in determining whether the reasons given for discharge were pretextual).

We also believe that, contrary to Mr. Fortier's contention, Riecks' informal assessment of Mr. Fortier's performance in 1992 is not sufficient to raise an issue regarding the genuineness of Aguiña–Tudela's formal evaluation. Riecks himself indicated that he did not supervise Mr. Fortier for a sufficient period of time to permit an intelligent appraisal. Aguiña–Tudela was Mr. Fortier's supervisor at the time of discharge; it was her responsibility to gather information from the relevant sources, including Riecks, and to write a comprehensive evaluation for the year. Mr. Fortier's subjective self-appraisal also cannot create a genuine issue of fact regarding the honesty of Aguiña–Tudela's assessment of his performance. *See, e.g., Gustovich v. AT & T Communications, Inc.,* 972 F.2d 845, 848 (7th Cir.1992) (noting that "[a]n employee's self-serving statements about his ability" are insufficient to contradict an employer's negative evaluation and do not create a material dispute about the employer's honesty or establish pretext). Moreover, even if Mr. Fortier's personal appraisal contains true statements about his accomplishments, Aguiña–Tudela was entitled to determine that the deficiencies in his performance outweighed such accomplishments.[11]

Nor can we say that any failure on the part of Ameritech to follow its own policies and procedures in terminating Mr. Fortier provides evidence of pretext. Mr. Fortier's 1992 review stated that he would be placed on a counseling statement to support disciplinary action if his poor performance continued. However, Mr. Fortier was never placed on a counseling statement before being terminated. Neither Ameritech's decision not to issue a counseling statement nor its categorization of Mr. Fortier's termination demonstrates pretext. Ameritech's Counseling Statement Policy appears to make the issuance of a counseling statement discretionary.[12] In any event, Ameritech's decision not to issue one was not a deviation from its practices.[13] In *Giacoletto v. Amax Zinc Co.,* 954 F.2d 424, 427 (7th Cir.1992), the court said that an employer's failure to follow policies designed to help employees overcome their deficiencies may show that the employer never really thought the employee had any deficiencies, and thus that the employer's asserted reason for termination (deficient performance) might be pretextual. In this case, however, the evidence shows that Aguiña–Tudela did in fact think that Mr. Fortier's performance was seriously deficient, and also shows her repeated warnings and counseling to Mr. Fortier and her February 1993 offer to provide Mr. Fortier with the services of an industrial psychologist. Under these circumstances, the failure to give a counseling statement could not support a jury verdict of pretext. Finally, Ameritech's decision not to discharge Mr. Fortier under the resizing program casts little light on the issue of pretext. Whether he was terminated under the program or simply discharged for poor job performance, the fact remains that he was terminated for failure to live up to the company's standards of performance.

## Conclusion

There was neither direct evidence of discrimination nor sufficient indirect evidence under the *McDonnell–Douglas* approach to justify submission of this case to the trier of

---

**11.** Furthermore, we do not believe that the fact that Aguiña–Tudela destroyed the performance files of her other employees and kept only Mr. Fortier's file has denied Mr. Fortier the opportunity to compare his alleged poor performance, in particular his tardiness in completing assignments, with that of his co-workers.

**12.** The Policy provides:

Written Counseling Statement procedures provide a formal sequence of steps to ensure the objective documentation of an employee's unsatisfactory performance. To ensure the legal and fair treatment of all Ameritech Mobile employees, it is essential that supervisors consistently adhere to these procedures.

When a supervisor determines that an employee is not meeting legitimate performance expectations and chooses to issue a written Counseling Statement, the following procedures must be followed. . . .

R.31, Tab M.

Although the first paragraph makes counseling statements sound mandatory, the word "chooses" in the second paragraph appears to add a discretionary element.

**13.** Ameritech provided evidence that it had terminated at least 35 employees for poor performance without issuing any counseling statement, thus demonstrating that the policy was considered discretionary.

fact. The evidence submitted by Mr. Fortier raises no more than a "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the judgment of the district court is affirmed.

AFFIRMED.