William THOMPSON, Plaintiff–
Appellant,

v.

JOHN J. MADDEN MENTAL
HEALTH CENTER,
Defendant–Appellee.

No. 00–4297.

United States Court of Appeals,
Seventh Circuit.

Argued April 25, 2002.

Decided May 9, 2002.

Before CUDAHY, RIPPLE, and
ROVNER, Circuit Judges.

## ORDER

William Thompson, an African American, sued the John J. Madden Mental Health Center (the "Center") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, claiming that his supervisor discriminated against him by disciplining him more severely than his Caucasian co-workers and retaliated against him by suspending him after he complained to the Center that he was being harassed. The district court granted summary judgment to the Center, and Mr. Thompson appeals. We affirm

### I.

Since 1993 Mr. Thompson has worked for the Illinois Department of Human Services (the "Department")[1] at the Center, a mental health facility in Hines, Illinois. Mr. Thompson is an activity therapist, and his duties include organizing and conducting recreational programs, social activities, special events, and holiday activities.

In the Spring of 1998, on the recommendation of Mr. Thompson's supervisor, Roberto Requena, the Center suspended Mr. Thompson for seven days (later reduced to five days) for neglecting his duties on three occasions. The first incident occurred in January 1998 after Mr. Requena assigned Mr. Thompson responsibility for organizing the Center's annual Black History Month dinner. Among other things, Mr. Thompson had to provide the Center's dietary staff with a list of attendees. The dietary staff needed the list to avoid preparing duplicate in-quarters meals for patients who would be attending the dinner (and thus not eating in their rooms). Mr. Thompson never gave the dietary staff an attendee list. Instead, he assigned the task to Kevin Kelly, a rehabilitation coordi-

nator. But Mr. Kelly never created the list, and Mr. Thompson never followed up with him or asked anyone else to create a list. Because the dietary staff did not have an attendee list, they prepared duplicate meals.

The second incident occurred about a month later, on February 26, 1998, when Mr. Thompson was scheduled to lead patient activities in Pavilion 7 from 2:00 to 3:00 p.m. That day Mr. Thompson had taken a group of patients to a museum. Upon returning (around 2:00 p.m.), Mr. Thompson attended a staff development training class instead of going to Pavilion 7. He had not registered or received prior approval for the class. He did not ask anyone to cover for him in Pavilion 7, so there were no patient activities for his assigned hour. Mr. Thompson does not deny that he was assigned to Pavilion 7 and that he failed to arrange coverage. He asserted in his Local General Rule 56.1 statement of facts ("Rule 56.1 Statement"), however, that he was entitled to a lunch break after returning from the museum, and that he attended the training class in lieu of lunch. Mr. Thompson also averred that he did not pre-arrange to attend the class because he did not know about it until after he returned from the museum, and that he needed to attend because Mr. Requena was pressuring him to satisfy his mandatory training requirements. As for failing to arrange substitute coverage, Mr. Thompson insisted that other activity therapists would not commit to cover for him, but he admitted that this did not absolve him from his responsibility to arrange coverage.

The final incident occurred the following month, on March 4, 1998, while Mr. Thompson was supervising a patient who suffered from mental retardation. The pa-

---

**1.** Mr. Thompson may have named the wrong defendant (*i.e.,* the Center rather than the Department), but neither party raises the issue on appeal.

tient could not be left unsupervised because of his low level of functioning. While the patient was dressing in the locker room, Mr. Thompson went to the gym next door (where several people were playing basketball) and stood in the doorway. Mr. Thompson admitted in his Rule 56.1 Statement that he could not see the patient in the locker room from where he was standing, and that he would not have known if the patient had left the locker room through a back doorway that leads to the pool area. The next day, Nancee Miller, another activity therapist, submitted an "Unusual Activity Report" stating that she had witnessed Mr. Thompson playing basketball instead of supervising his patient. Although Mr. Thompson denied playing basketball, he admitted that at one point the ball rolled to him and that he shot it at the hoop.

Based on these incidents, Mr. Requena recommended that the Center discipline Mr. Thompson. The Center has an established disciplinary process, the basics of which are undisputed. Supervisors initiate disciplinary proceedings by contacting the Labor Relations Administrator, the Human Resources Director and the next highest ranking supervisor to explain the need for discipline. Together this group reviews the evidence supporting discipline, determines the charges, reviews the rules for violations, and prepares the employee's pre-disciplinary notice (advising the employee that a hearing before the group will take place). Then the employee is given a pre-disciplinary hearing and, thereafter, 24 to 36 hours to respond. The same group then reviews the employee's response and makes a final determination. When matters for discipline occur in close proximity, it is not unusual for the supervisor to raise them all at one pre-disciplinary hearing in order to save time.

On March 31, 1998, after giving Mr. Thompson a pre-disciplinary hearing and an opportunity to respond, the Center suspended him for seven calendar days. Mr. Thompson filed a grievance pursuant to his union agreement and, following another hearing, the Center reduced his suspension to five work days.

## II.

In April 1998 Mr. Thompson filed a charge with the Equal Employment Opportunity Commission, alleging that the Center disciplined him for conduct that the Center does not penalize when Caucasian employees engage in it. Mr. Thompson also alleged that Mr. Requena suspended him in retaliation for filing a union grievance challenging his past performance evaluations. In March 1999 the EEOC issued Mr. Thompson a right-to-sue letter (because more than 180 days elapsed without a determination of his charge), and in April 1999 he filed this lawsuit, re-asserting the allegations in the EEOC charge.

After the parties conducted discovery, the Center moved for summary judgment. In response, Mr. Thompson presented no direct evidence of discrimination, but instead attempted to stave off summary judgment under the indirect burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Mr. Thompson also changed his retaliation theory. Specifically, he presented a letter dated February 5, 1998, that he wrote to Ken Wade, the Department's equal employment opportunity officer in Springfield, complaining that he had been "harassed and discriminated against" in connection with various job-related events. Mr. Thompson now asserted that Mr. Requena had suspended him in retaliation for his letter to Mr.

Wade as well as for grieving his performance evaluations.

The district court granted summary judgment to the Center, concluding that Mr. Thompson had not established a prima facie case of discrimination because he presented no evidence that he was treated differently than similarly situated, non-African American employees. As to retaliation, the court concluded that Mr. Thompson could not establish a causal link between his letter to Mr. Wade and his suspension (the court did not address the grievance portion of the claim, and Mr. Thompson does not raise it on appeal). The court reasoned that, although Mr. Thompson demonstrated a temporal nexus between his letter and his suspension, he presented no evidence that Mr. Requena knew about the letter.

We note that, although Mr. Thompson changed his retaliation theory (his EEOC charge does not mention his letter to Mr. Wade), the Center did not argue that the district court should have disregarded the claim on that basis. *See Gibson v. West,* 201 F.3d 990, 993–994 (7th Cir.2000) (recognizing that a plaintiff's claims are limited by the claims in the EEOC charge, but the limitation is not jurisdictional and the defendant waives it by not raising it).

## III.

In its de novo review, we evaluate the evidence in the light most favorable to Mr. Thompson, drawing all reasonable inferences in his favor. *See Jordan v. Summers,* 205 F.3d 337, 341 (7th Cir.2000). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

## A. Discrimination

On appeal Mr. Thompson challenges the district court's conclusion that he failed to present evidence that he was treated differently than any similarly situated, non-African American. Under the *McDonnell Douglas* framework (1) the claimant must establish a prima facie case of discrimination, (2) the defendant must articulate a legitimate, non-discriminatory reason for its employment action, and (3) the claimant must prove that the employer's proffered reason is a pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 802–04. To establish a prima facie case of discrimination, Mr. Thompson had to show that (1) he was a member of a protected class, (2) he was meeting the Center's legitimate performance expectations, (3) he suffered an adverse employment action, and (4) the Center treated similarly situated persons not in the protected class more favorably. *See Johnson v. Zema Sys. Corp.,* 170 F.3d 734, 743 (7th Cir.1999). The "similarly situated" element is the only one at issue on appeal. Specifically, Mr. Thompson identifies a number of Caucasian employees whom he says were treated more favorably and additionally contends that he presented "statistical evidence" that the Center treats Caucasians more favorably.

To establish that he is similarly situated, a plaintiff must show that the defendant more favorably treated someone outside the protected class who is directly comparable to the plaintiff "in all material respects." *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir.2002). The factors relevant to this standard depend on the context; in disciplinary cases like this one, a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct. *Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 617 (7th Cir.2000).

### 1. Mr. Thompson's Comparables

■ None of the employees Mr. Thompson compares himself with bear meaningful similarity to him. He identifies Mr. Kelly, the Caucasian employee whom Mr. Thompson assigned to create an attendance list for the Black History Month dinner (the record does not reflect whether Mr. Thompson actually had the authority to delegate the task to Mr. Kelly, and the parties do not raise the issue on appeal). Although the Center did not discipline Mr. Kelly for not creating the list, he is not comparable to Mr. Thompson because his conduct is qualitatively different–Mr. Thompson admitted in his deposition that he was the event coordinator who bore overall responsibility for organizing the dinner, including creating the attendance list. Additionally, Mr. Kelly is not comparable because he holds a different position (rehabilitation coordinator) and reports to a different supervisor. *See Radue*, 219 F.3d at 618 ("Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable ... for the simple reason that different supervisors may exercise their discretion differently.").

Mr. Thompson also identifies Kathy Leibich, a Caucasian activity therapist whom, he says, the Center did not discipline for taking lunch after returning from a museum outing with patients. But like Mr. Kelly, Ms. Leibich reports to a different supervisor and engaged in dissimilar conduct–Mr. Thompson does not contend (nor does the record contain any evidence) that she abandoned any other duties to take lunch like he did (the patient activities in Pavilion 7).

Mr. Thompson's remaining attempts to compare himself to Caucasian employees require little discussion. He asserts that certain Caucasian activity therapists left patients unsupervised but were not disci-plined. But he admitted in his deposition that he did not know whether any of the Center's supervisors were aware of these incidents, and on appeal he points to no evidence that they were. Mr. Thompson also argues that Mr. Requena never suspended any Caucasian or "non-complaining" activity therapists or gave them poor performance evaluations. On appeal the Center does not address this argument, but it is nonetheless unavailing because Mr. Thompson identifies no other activity therapists under Mr. Requena's supervision whose conduct warranted suspension or a poor performance evaluation. Finally, Mr. Thompson maintains that the Center treated him less favorably than Caucasian employees when Mr. Requena deviated from the Center's progressive discipline policy by "stacking" multiple infractions against him in one pre-disciplinary hearing. But he admitted in his Rule 56.1 Statement that it was not unusual for the Center to present multiple disciplinary matters in close proximity at the same hearing, and he does not now contend that his infractions lacked the requisite proximity.

### 2. Mr. Thompson's "Statistical Evidence"

■ Mr. Thompson also argues that the Center's own statistics show that the Center routinely disciplined African American employees more severely than Caucasian employees, thus creating an issue of fact as to whether he was treated less favorably in this case. A plaintiff can establish the similarly situated prong using statistical evidence. *Chavez v. Ill. State Police*, 251 F.3d 612, 638 (7th Cir.2001); *see also Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 363 (7th Cir.2001) (opining that under the right circumstances statistics alone can establish a prima facie case of discrimina-

tion; citing conflicting authority from a majority of the circuits).

But Mr. Thompson offered no *statistical* evidence; what he offered was only raw data that the Center produced in response to an interrogatory–specifically, that over a 10–year period the Center suspended 10 employees, including 4 African Americans, 4 Caucasians, and 2 Hispanics. By definition, statistics offer interpretations of raw data. *See* WEBSTER's II NEW COLLEGE DICTIONARY 1078 (1995) (defining statistics: "The mathematics of the collection, organization, and interpretation of numerical data."). Mr. Thompson makes no attempt to interpret the Center's data, which does not identify the decision-makers, the conduct for which the various employees were disciplined, or the racial make-up of the Center's total workforce. *Cf. Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 423 (7th Cir.2000) (rejecting statistics that contained only information about employees in departments other than the plaintiff's); *Paluck v. Gooding Rubber*, 221 F.3d 1003, 1014 (7th Cir.2000) (rejecting data as not meaningful because it failed to describe the characteristics of the employees included, such as salary, job duties, whether part-time or full-time, etc.). Indeed, the data, such as it is, actually undercuts Mr. Thompson's case because it shows that the Center suspended Caucasian employees for durations at least as long as Mr. Thompson's 5–day suspension (*i.e.*, the Center suspended two of the Caucasian employees for 5 days, one for 15 days, and one for 29 days).

The district court properly granted summary judgment to the Center.

## B. Retaliation

In *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640 (7th Cir.2002), we clarified the methods of proving a retaliation claim. A plaintiff can prove retalia-

tion either using direct evidence or under the *McDonnell Douglas* framework. Under the direct method, a plaintiff must show that he engaged in protected activity and suffered an adverse job action as a result. *Id.* at 644. Under *McDonnell Douglas* a plaintiff must show that after engaging in protected activity he, and not any similarly situated employee who did not file a charge, suffered an adverse job action even though he was performing satisfactorily. *Id.* Under the latter standard, the plaintiff "need not show even an attenuated causal link." *Id.*

It is unclear which standard Mr. Thompson believes should govern on appeal. This is because the district court (which did not have the benefit of *Stone* when it granted summary judgment in 2000) seemed to conclude that Mr. Thompson failed to establish a prima facie case of retaliation, but reached that conclusion by applying the standard applicable under the direct method of proof. Mr. Thompson's brief does not clarify which standard he is arguing, but simply challenges the district court's conclusion that he failed to present evidence of a causal link between his February 5, 1998, letter to Mr. Wade and his March 31, 1998, suspension. He argues that he established a causal link because, even if Mr. Requena did not know about the letter, the Center had constructive knowledge of it because it came to the attention of someone (Mr. Wade, the Department's EEO officer) authorized to "do something about it." Mr. Thompson does not argue that Mr. Requena knew about the letter.

But confusion about the applicable legal standard matters not because Mr. Thompson's argument fails whichever standard applies. Under *McDonnell Douglas* Mr. Thompson's claim fails for the same reason his discrimination claim fails–he identifies no similarly situated employees who did

not engage in protected activity and whom the Center treated more favorably.

■ Under the direct method, Mr. Thompson's argument fails because the Center is correct that there is no retaliation unless the decision-maker actually knows about the plaintiff's protected activity. *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 755–756 (7th Cir.2000); *Pressley v. Haeger*, 977 F.2d 295, 297 (7th Cir.1992) ("There is no 'constructive intent,' and constructive knowledge does not show actual intent [to discriminate] ... A supervisor who does not find out what is going on in the workplace should be sacked as incompetent, not lumped with bigots."). Mr. Thompson's reliance on *Young v. Bayer Corp.*, 123 F.3d 672 (7th Cir.1997), is misplaced. That case had nothing to do with retaliation; it was a sexual harassment case in which we held that an employer can be liable for sexual harassment if an employee reports harassment to a person with the authority to remedy it and the company fails to take appropriate remedial action. *Id.* at 674.

Moreover, Mr. Thompson's argument assumes that if the Center had knowledge of his letter to Mr. Wade, then the letter must have motivated his suspension. But knowledge and causation are not equivalent. *See Sanchez v. Henderson*, 188 F.3d 740, 747 (7th Cir.1999) ("We have previously held that, as a matter of law, mere knowledge of the plaintiff's protected activity prior to an adverse employment action does not establish a retaliatory motive."); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (distinguishing knowledge from causation).

Finally, although it does not affect the outcome in this case, we question the Center's contention on appeal that Mr. Thompson's letter does not constitute protected activity for summary judgment purposes because it does not specifically mention race discrimination. Mr. Thompson wrote to the person responsible for addressing unlawful discrimination in his workplace. He repeatedly used the words "discrimination" and "harassment" to describe what he viewed as conduct designed to single him out, threaten him, or exclude him. Particularly because the Center offers no evidence (such as deposition testimony) as to the letter's meaning or how Mr. Wade interpreted it, a jury could infer that Mr. Thompson reasonably believed he was complaining about race discrimination, *see Hamner v. St. Vincent Hosp. and Health Care Center, Inc.*, 224 F.3d 701, 706–707 (7th Cir.2000) ("[To establish protected activity, it] is sufficient if the plaintiff has a sincere and reasonable belief that he is opposing an unlawful practice."), and that Mr. Wade so interpreted the letter.

AFFIRMED.