UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued March 1, 2005
Decided May 10, 2005

**Before**

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 04-2356

| | |
|---|---|
| SIR EZELL WILKINS, | Appeal from the United States |
| Plaintiff-Appellant, | District Court for the Northern |
| | District of Illinois, Eastern Division |
| *v.* | |
| | No. 02 C 9232 |
| RIVEREDGE HOSPITAL, | |
| Defendant-Appellee. | Milton I. Shadur, |
| | *Judge.* |

**O R D E R**

After Riveredge Hospital fired Sir Ezell Wilkins from his position as a mental health counselor and upheld that decision in a grievance hearing, Wilkins filed suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to e-17, alleging gender discrimination.  The district court granted summary judgment in favor of Riveredge, reasoning that there was not enough evidence to support Wilkins's reverse-discrimination claim.  We affirm.

**I.**

Taking all facts and inferences in favor of Wilkins as the nonmoving party, *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1107 (7th Cir. 2004), we recount the events underlying his discrimination claim.  Wilkins was one of two

full-time male mental health counselors who worked the evening shift in the female adolescent unit at Riveredge hospital.  Female patients in the unit, ranging from age 12 to 18, suffer mental health issues such as depression, suicidal tendencies, drug and alcohol abuse, and post-traumatic stress from sexual abuse.

Mental health counselors monitor the safety of the patients and occasionally become involved in matters of hygiene, such as bathing and menstruation.  As part of their duties, counselors conduct "patient rounds" at 15-minute intervals and document the patients' locations on "Psychiatric Nursing Flow Sheets."  This procedure provides the hospital with a means to account for patients and ensure they are not harming themselves.  The task requires counselors to "eyeball" the patient when recording her whereabouts.

Pat Thomas, the Riveredge director of patient care services, hired Wilkins at the same time as Dwayne Ross and Lori Carr, two other mental health counselors.  Elaine Shemroske, the nurse manager of the unit and Thomas's subordinate, directly supervised all counselors in the adolescent girls' unit including Wilkins and Ross.  Shemroske was involved in hiring candidates and could recommend firing employees.

Shemroske's personal views about the hospital policy and the misconduct of two other employees provide the historical backdrop for this case.  Shemroske openly expressed her belief to Thomas and to other nursing managers and counselors on her unit that Riveredge should staff its adolescent girls' unit with a higher ratio of female counselors to males.  She advocated that "the reality of the work" on an adolescent girls' unit was that sometimes "you really need females," referring to issues such as bathing and searches.  Shemroske also worried about unhealthy relationships forming between female patients and male staff members, noting that the patients often have "rescue fantasies about men" and that "males needed to be extremely mature and have their own stuff together."  She brought these concerns to the attention of Thomas, and even went so far as to personally contact the hospital's attorneys to ask if she could consider gender in hiring.  Thomas, her boss, disagreed with Shemroske's views, instead identifying a "balancing" of male and female staff as the hiring goal and noting that *more* males needed to be hired.  Shemroske attested in her deposition that she was ultimately persuaded by Thomas's position, although she did not say when the change occurred.

The misconduct of the other employees, as relevant here, established that failing to accurately record the locations of the patients on their Flow Sheets during patient rounds is grounds for termination.  In July 2001, Riveredge fired a male and a female employee after an investigation into the escape of two patients revealed that these employees had falsely documented having seen the patients

during rounds.  Afterwards, Thomas and the nurse managers including Shemroske stressed to counselors that the hospital would not tolerate falsification of records, and that the "precedent" of termination had been set for such lapses.

The specter of falsified records arose again on November 7, 2001, when Wilkins inaccurately recorded a Flow Sheet for a patient he discharged earlier that day; his actions and the hospital's response triggered this lawsuit.  When Wilkins arrived at work that day at 3:00 p.m., the patients were all confined to the two "day rooms" because the unit was on "lockdown" due to a missing set of keys.  A little before 6:00 p.m., Shemroske ordered each patient to be confined to her room for the rest of the night.  Moments later, however, Wilkins discharged one of the patients, Dominque, to her mother and escorted the two outside the facility.  According to Wilkins's testimony at his deposition, another counselor, Sherri Dean, saw that Dominque was being discharged.  When discharging Dominque, Wilkins pulled her Flow Sheet from the pile of other patients (a separate sheet is used through an entire day for each patient) and placed it on the nurse's desk instead of filing it in a lock box in accordance with his standard practice.  Unbeknownst to Wilkins, Dominque's sheet was placed back in the pile with the other patients' Flow Sheets during the time he escorted Dominque out of the hospital.

Although staff members generally are responsible for making rounds during no more than two hours per shift, Wilkins covered for other employees preoccupied with the lockdown and completed patient rounds at various times between 5:15 p.m. and 11:30 p.m.  According to Wilkins, his usual practice was to mark down the location of each patient and initial her Flow Sheet at the time he observed her.  In his deposition, however, Wilkins claimed that on this occasion, because the patients were all confined to their rooms when he conducted his rounds, he instead verified first that each patient was present and then completed all the Flow Sheets at once without looking at the names on the sheets because the information he was recording on each sheet was the same.  Not realizing that Dominque's Flow Sheet had been returned to the stack, Wilkins initialed her as present as well, even though he obviously knew she was no longer a patient at the hospital.  Still, Wilkins acknowledged at his deposition that a therapy session was held in the day room that night; he did not say if every patient was at the session or, if not, how he came to mark Dominque as being at that session between 8:30 and 8:45 p.m.  During those same six hours, Sherri Dean conducted the rounds twice at 10:30 p.m. and 10:45 p.m.  She too marked on Dominque's Flow Sheet that the patient was in her room sleeping.  While reviewing the Flow Sheets at 11:30 p.m. at the end of his shift, Wilkins realized that he completed Dominque's sheet for the period after she was discharged.  Wilkins insists that he placed a post-it note on Dominque's sheet advising Shemroske of his mistake and placed the sheet in Shemroske's mailbox, although Shemroske never mentioned the note to her supervisors and at her deposition denied ever receiving it.

The next day Shemroske brought Dominque's inaccurate sheet to the attention of Thomas. Thomas and Shemroske came to the conclusion that Wilkins had falsified Dominque's Flow Sheet and that he should be terminated for the offense. Thomas next contacted Karen Lindsey in human resources to inform her of the proposed termination. Thomas and Lindsey sought and received approval to terminate Wilkins from CEO Mark Russell, who had sole authority to fire an employee. When deposed, all four management employees denied knowing at that time that Dean had also initialed Dominque's sheet after she was discharged.

Thomas, Shemroske, and Lindsey met with Wilkins when he arrived for work that day. When Thomas confronted Wilkins with the inaccurate Flow Sheet, he admitted to making the entries. Thomas informed him that falsifying a report is grounds for termination and presented him with paperwork for his discharge. Wilkins was told to put in writing anything he had to say about the events of the night before. The meeting concluded after Thomas explained the grievance process to Wilkins.

Shemroske met with Dwayne Ross and the other counselors to inform them that Wilkins no longer worked at Riveredge but declined to give the reason for his departure. When Ross approached Shemroske after the meeting, Shemroske revealed that the discharge related to Wilkins's falsifying records. According to his testimony at summary judgment, Ross responded by questioning whether Dean would also be fired because she "covered for him last night so that means her name is on there too." Shemroske did not reply, and there is no evidence that she confronted Dean or ever relayed Ross's comments to Thomas or anyone else.

Wilkins appealed his firing through grievance procedures in late November 2001. Typically, the CEO conducts the grievance hearing, but Russell had a schedule conflict, so Jack Barzilai, the Chief Financial Officer, presided over the hearing with Lindsey observing. Barzilai denied Wilkins's appeal because "the circumstances explained by Mr. Wilkins did not justify or excuse his conduct." Having internally grieved his termination to no avail, Wilkins filed a charge with the Equal Employment Opportunity Commission, alleging gender discrimination based on the disparate disciplinary treatment given to him as compared to Dean, who had yet to be confronted about her like handling of Dominque's Flow Sheet. Wilkins knew about Dean's conduct the night of November 7, 2001; he conceded at his deposition that he never alerted anyone at Riveredge to her similar actions.

All those involved in Wilkins's termination, including Shemroske, claim to have first discovered that Dean erroneously completed Dominque's Flow Sheet when the EEOC investigator questioned why Dean was not fired along with Wilkins. Once notified of Dean's similar conduct, Thomas recommended to CEO Russell and to Mark Pieart, the new director of human resources, that Dean be

fired, and Russell authorized the termination. Dean appealed her discharge in a grievance hearing before Russell, who relented. Later during his deposition, Russell testified that whether to terminate an employee for falsifying documents was a "reviewable matter," and explained that he considered various factors in reviewing Dean's case, including "the environment, the clinical surroundings and methodology of entry." According to Russell, the situation warranted treating Dean more favorably because (1) Wilkins had "actually facilitated the physical discharge"; (2) no falsification would have occurred if Wilkins had followed procedure and removed Dominque's sheet from the other sheets; and (3) Wilkins's entries had Dominque in group, in her room, and sleeping whereas Dean's entries only marked Dominque as sleeping.

After receiving a right-to-sue letter from the EEOC, Wilkins filed this suit in December 2002, alleging gender discrimination. The district court granted Riveredge's motion for summary judgment, reasoning that Wilkins lacked sufficient evidence to support a claim of discrimination under either the direct method or the indirect method. For the direct method, the court recognized that Shemroske made comments that could be construed as demonstrating bias against men. But the court reasoned that Shemroske was not the decisionmaker and, in the court's view, there was no evidence that she influenced Thomas, Lindsey, or Russell or played a role in the grievance procedure. In determinating that Wilkins also could not establish discrimination through the indirect method, the court reasoned that Dean was fired immediately upon the discovery of her conduct and later rehired based on identified differences in her conduct as compared to Wilkins. In addition, the court commented that different decisionmakers were involved in the grievance processes for Wilkins and Dean. The court thus concluded that the two were not similarly situated.

## II.

Two potential claims under Title VII could be brought from the different treatment of Wilkins versus Dean: 1) the immediate firing of Wilkins in contrast to the several-month delay before Dean was fired and 2) the rehiring of Dean and not Wilkins. Regarding the first claim, Wilkins does not frame his argument to focus on the several-month delay in firing Dean, and so we do not address it. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 920 (7th Cir. 2000) (initial termination decision separate and distinct from subsequent decision not to rehire employee). That said, there may have been merit to a claim suggesting that there was discrimination in the several-month delay between Wilkins's termination and Dean's based on the role Shemroske played in causing that delay. Shemroske's desire to consider gender in hiring counselors suggests a discriminatory animus not justified by any hospital policy of considering gender a bona fide occupational qualification. *See Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d

1106, 1112 & n.9 (7th Cir. 1998) (when BFOQ not argued, supervisor's comment about need for woman in EEO position so that women felt comfortable reporting harassment was probative of discriminatory intent); *Venters v. City of Delphi*, 123 F.3d 956, 972-73 (7th Cir. 1997) (remarks by decisionmaker reflecting propensity to evaluate employees based on illegal criteria are direct evidence of discrimination). And Shemroske's withholding from decisionmakers Thomas and Russell key information—her early knowledge of Dean's identical behavior and the post-it note that Wilkins left for her—may have imputed her discriminatory animus to Thomas and Russell, at least until their independent discovery of Dean's behavior several months later. *See Lust v. Sealy, Inc.*, 383 F.3d 580, 583-84 (7th Cir. 2004) (supervisor who could only recommend promoting employee was not decisionmaker but could still potentially influence decisionmaker by withholding information); *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 754 (7th Cir. 2000) (comments not tied directly to termination but showing opinion "clouded" by discriminatory animus could cast doubt on termination if supervisor influenced decision).

Instead, Wilkins's claim with regard to his initial firing focuses generally on Shemroske's discriminatory animus and her role in the decisionmaking process. But without a claim focusing on the delay rather than the general decision to fire Wilkins, the challenge falls away. The decisionmakers, Thomas and Russell, also fired Dean upon discovery of her conduct, and so the treatment of Wilkins and Dean for the initial termination decisions ultimately was the same. Hence, there is insufficient evidence that Shemroske's discriminatory animus influenced the overall decisionmaking process. *See Cerutti v. BASF Corp.,* 349 F.3d 1055, 1063 (7th Cir. 2003) (even though subordinates with discriminatory animus participated in selection panel, no other evidence from which jury could infer that animus influenced panel's deliberation to fire employees). Rather, the relevant adverse action for Wilkins's claim is the later decision to rehire Dean and not him.

Yet Wilkins cannot succeed on this claim under either the direct or indirect method. For the direct method, Wilkins must show either through direct or circumstantial evidence that impermissible consideration of his gender motivated Riveredge to fire him initially or to uphold that decision in the grievance proceedings. *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938-39 (7th Cir. 2003). Where there is no direct evidence of employer's discriminatory animus, a "convincing mosaic" of circumstantial evidence pointing "directly to a discriminatory reason for the employer's action" may suffice. *Sartor v. Spherion Corp.*, 388 F.3d 275, 278 (7th Cir. 2004) (internal quotations and citations omitted). Here it is undisputed that Shemroske had no role in the grievance proceedings, and so her discriminatory animus could not have tainted those decisions. *See Cerutti*, 349 F.3d at 1062 (lack of involvement in decision breaks causal connection with subordinate's discriminatory animus). Barzilai's decision to uphold Wilkins's termination was not a rubberstamp of the initial decision to fire him: Barzilai held

a hearing which Lindsey observed where Wilkins had a full opportunity to explain his conduct. *Cf. Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (finding discriminatory animus of "man on the spot" tainted committee where committee acted as mere rubberstamp of that employee's decision). And Barzilai expressed his reasons for not rehiring Wilkins in his affidavit, noting that he believed that Wilkins's explanation did not justify his conduct and that he did not find it persuasive. Without more to tie Shemroske's comments to the decision to fire Wilkins, there is insufficient direct evidence that discriminatory animus motivated his termination.

Wilkins also fails to establish that genuine issues of material fact exist under the indirect method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). For Wilkins to make out a prima facie case in this context, he needed to establish that (1) background circumstances exist demonstrating that Riveredge had reason or inclination to discriminate invidiously against males; (2) that the discipline amounted to an adverse employment action; and (3) that he was disciplined more harshly than a similarly situated female employee. *See Katerinos v. U.S. Dep't of the Treasury,* 368 F.3d 733, 736 (7th Cir. 2004); *Flores v. Preferred Tech. Group*, 182 F.3d 512, 515 (7th Cir. 1999) (plaintiff who was fired ostensibly for engaging in same misconduct as other employees who were retained did not need to show that she was meeting employer's legitimate job expectations in order to pursue claim for disparate disciplinary treatment). A similarly situated employee must engage in similar conduct, be subject to the same workplace rules, and have the same supervisor. *Adams*, 324 F.3d at 940. With the prima facie case established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the discharge. *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). The plaintiff can then present evidence that the reason is pretextual. *Id.*

We need not go beyond the fourth prong of the prima facie case because Wilkins cannot demonstrate that Dean and he were similarly situated. As underscored by Russell's articulation of why he rehired Dean, she committed a less egregious act than Wilkins. Dean made only two false notations in a half hour period, whereas Wilkins recorded incorrect entries for five hours. *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 546 (7th Cir. 2002) (employee not comparable to others who falsified activity logs but were not disciplined because employee's falsification more serious and was committed after prior warnings). The more minor role Dean played presents mitigating circumstances that distinguishes her conduct from Wilkins and thus Riveredge's treatment of her. *See Ezell v. Potter,* 400 F.3d 1041, 1050 (7th Cir. 2005) (employees not similarly situated where there are mitigating factors); *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002). Because Wilkins failed to establish a prima facie case of discrimination, our inquiry ends. We AFFIRM the judgment of the district court.